**PANADERIA LA DIANA, INC.,**
et al., Plaintiffs,

v.

**SALT LAKE CITY CORPORATION,**
et al., Defendants.

No. 2:99–CV–00147PGC.

United States District Court,
D. Utah,
Central Division.

Nov. 3, 2004.

Dale F. Gardiner, Jennifer L. Lange, Michael Martinez, Salt Lake City, UT, for Plaintiffs.

Morris O. Haggerty, Peter L. Rognlie, Scott R. Ryther, Salt Lake City, UT, for Defendants.

## ORDER GRANTING SALT LAKE CITY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT IN PART AND DENYING IN PART

CASSELL, District Judge.

This civil rights action arises out of the execution of a search warrant at Panaderia La Diana, a Latino-owned tortilla factory, bakery, and restaurant in Salt Lake City. It is before the court on the Salt Lake City Defendants' Motion for Summary Judgment. All of the initially-named defendants have been dismissed by prior orders of the court with the exception of Salt Lake City Corporation and various Salt Lake City officials and police officers, specifically: Russell Amott, James Blomer, DeeDee Corradini, Amy DeSpain, Tim Doubt, Wanda Gabbetas, Craig Gleason, Melody Gray, Greg Hagelberg, Marty Kaufman, Phil Kirk, Ruben Ortega, John Ritchie, Michael Ross, Morgan Sayes, Troy Siebert, Chad Steed, and Marty Vuyk.

After a thorough review of the pleadings, depositions, affidavits, and other materials submitted to the court, the court finds that genuine issues of material fact remain with respect to two claims against the City: First, whether the length of the seizure of the persons on the premises during the execution of the warrant was reasonable under all of the circumstances; and whether the warrant was executed in a reasonable manner. Accordingly, summary judgment is denied on these claims. The court GRANTS summary judgment in favor of the individually named officers in both their individual and official capacities on all claims. The court GRANTS summary judgment in favor of the City on all other issues.

### BACKGROUND

Plaintiffs in this action are owners, employees, and customers of Panaderia La Diana, a Latino-owned tortilla factory, bakery, and restaurant located at 56 West 900 South in Salt Lake City, Utah. On April 24, 1997, Salt Lake City police officers, in conjunction with officers from the INS, the DEA, and the FBI, aggressively executed a no-knock search warrant on the premises of La Diana. In executing the warrant, nearly every person on the premises was handcuffed and detained, some for as long as three hours. Plaintiffs have filed suit alleging various federal and state causes of action.[1] On the defendants' motion for summary judgment, the court takes all facts in the light most favorable to the plaintiffs. Viewed in that light, the court finds the following facts have been sufficiently supported.

---

1. *See* Second Am. Compl. ¶¶ 85–135 (Aug. 13, 2003).

## The Investigation

In April 1997, Salt Lake City police began an investigation into drug-related activities in and surrounding Panaderia La Diana Restaurant and Tortilla Factory. Officer Troy Siebert of the Salt Lake City Police Department narcotics unit began the investigation after being approached by Dave Bancroft of the Utah Attorney General's office. Mr. Bancroft had apparently been into La Diana and had seen the prescription drug Darvon being sold over the counter. Using a confidential informant, Mr. Bancroft made at least one controlled buy of Darvon from a La Diana employee. Mr. Bancroft arranged a meeting with members of the Salt Lake City police force to discuss furthering the investigation. At the meeting discussing the Darvon sales there was also apparently some discussion about possible drug activity in the parking lot of La Diana involving cocaine and heroin.

Officer Siebert of the Salt Lake City police department was assigned as the lead investigator and began to collect information about drug-related activity at La Diana. Officer Chad Steed informed Officer Siebert that he had received e-mails from the community support division that some citizens had reported possible drug activity around La Diana. It is possible that these calls came from the owners and employees of La Diana who had been concerned about the drug sales occurring in the parking lot of their facility. Officer Isaac Atencio testified at his deposition that the owner of La Diana, Rafael Gomez, had been trying to get police to take care of the drug dealers in the parking lot at La Diana since perhaps as early as 1994. Officer Atencio was assigned to the Community Support Division patrolling an area which included La Diana. During his time in this assignment Rafael Gomez approached Officer Atencio on more than one occasion requesting that the police do something about the drug dealers who were using the parking lot at La Diana. Officer Atencio testified:

> I know that there were some problems in that area, and I had spoken with Mr. Gomez on a couple of occasions about the drug dealers on his property, problems he was having with false I.D.s and social security cards being sold right there. We had talked about it. On one occasion, I think the last meeting I had with him prior to my being transferred or my requesting out of that assignment, was dealing with the fact that there were a lot of drug dealers on that property and also the bar just south of it, in the alleyways, the adjacent properties, they were using his parking lot.[2]

It is not clear whether Officer Siebert was ever informed of the frequent calls from the owners of La Diana concerning the drug dealers in the parking lot. Instead, the investigation proceeded as though the activities in the parking lot were connected with La Diana.

Officer Siebert also spoke to Officer Tim Doubt during the investigation. Officer Doubt informed Officer Siebert that he had recently investigated possible drug dealing in the parking lot at La Diana. Officer Doubt had received a call from a secretary informing him that the manager of La Diana had called to report the presence of drug dealers in the parking lot. The manager, J. Dee Carlson, was told that the police would stop by. He then asked the secretary whether the police would be coming in cars or on bikes. The secretary was apparently a bit perplexed by the question and wondered why Mr. Carlson would be concerned about whether the police would be in cars or on bikes. Officer Doubt went to investigate the report and testified that as he approached

2. Dep. Isaac Atencio at 16 (July 8, 2004).

the parking lot Mr. Carlson started whistling. Officer Doubt testified that it was a common practice for a lookout to warn drug dealers of approaching police by whistling. Officer Doubt approached Mr. Carlson to speak with him. Officer Doubt testified that Mr. Carlson told him that he was concerned about the drug dealers in the parking lot and that he had called because if the police were not going to take care of it, the owners of La Diana would. Officer Doubt also testified that Mr. Carlson told him that the owner of La Diana, Rafael Gomez, carried a gun with him and kept one in the office. Officer Doubt testified that he did not ask Mr. Carlson about whistling. Officer Doubt believed Mr. Carlson was being deceptive and that he had made the call only to find out when the police would be arriving.

Mr. Carlson's testimony was that some months after he began working at La Diana, he and the owners became concerned about the increasing drug problem outside the factory. He had called the police a couple of months before the raid to report the activity. Mr. Carlson also testified that Rafael Gomez, the owner of La Diana, had called the police on four or five occasions to report the drug activity, as had another employee, Sergio Gomez. Indeed, several of the plaintiffs testified at their depositions that when the raid first began they were relieved because they thought the police were finally there to deal with the drug dealers in the parking lot.

Mr. Carlson also testified that on the day Officer Doubt arrived to investigate the report he was loading tortillas into a truck and when he saw the officers arrive he clapped "sarcastically" as if to indicate "You finally got here." [3] Mr. Carlson also testified that he did not whistle, "I said, you know. 'I'm the one that called you

guys, you know. I'm the one that's trying to, you know, solve the problem.'" [4] Finally, Mr. Carlson also testified that he could not recall whether he told the police that Mr. Gomez had a handgun or whether he had seen people outside the store carrying a gun. No arrests were made as a result of this investigation and it apparently went no further.

Officer Siebert also spoke to others during the course of the investigation. In the affidavit used to obtain the search warrant for La Diana, Officer Siebert states that a Detective Arthur Street of the Drug Enforcement Administration had informed him that he had received information from a confidential informant that quantities of cocaine were regularly delivered to persons at La Diana. It is not clear whether this referred to actual delivery to La Diana or simply to the drug dealers who were operating in the parking lot. Moreover, neither Officer Street or Officer Steed knew the source of this information. The affidavit also states that at least two "concerned citizens" had informed the police about ongoing drug distribution at the address. Officer Siebert also states in the affidavit that he personally had received information from a confidential informant about drug activity at the address. In neither instance does the warrant clarify whether these alleged activities were occurring only in the parking lot or whether the police had any information about persons inside La Diana being connected to the drug dealing.

Officer Siebert also went undercover and purchased "street level" amounts of cocaine and heroin from eight different persons. All of these purchases occurred in the parking lot of La Diana. Officer Chad Steed conducted surveillance during these controlled buys. None of these

---

**3.** Dep. of J. Dee Carlson at 25–26 (July 16, 2004).

**4.** *Id.*

transactions involved the owners or employees of La Diana and none of the purchases were made inside the store. Negotiations for two of the purchases, however, apparently took place inside the north door of the La Diana complex. Officer Siebert also testified that during one of the controlled buys, a signal was given to the drug dealers and Officer Siebert, along with others, ran into the La Diana complex to hide. Officer Siebert did not observe any weapons in the parking lot during these controlled buys. Although it was never confirmed that any owner or employee of La Diana was involved in dealing any drugs (other than Darvon), and despite the numerous calls from the owners and employees of La Diana expressing concern about the drug dealers in the parking lot, the police believed that La Diana itself, and Rafael Gomez in particular, were part of an ongoing narcotics operation involving cocaine and heroin.

### The Affidavit and Search Warrant

Officer Siebert prepared an affidavit for a search warrant detailing the investigative activities. The affidavit was first reviewed by Salt Lake County Deputy District Attorney Bud Ellett. The affidavit requested "no-knock" authority based on the belief that evidence might be destroyed. In addition, the affidavit included the information Officer Siebert had received from Officer Doubt concerning Rafael Gomez possibly having a firearm. The affidavit also states that "JD" had told Officer Doubt that he had seen three people in the parking lot with handguns.

The affidavit was presented to Judge Sheila McCleve. Judge McCleve authorized a "no-knock" search warrant to be executed during the day. Police next had to determine how to execute the warrant. Lt. Carroll Mayes, then the SWAT team leader and tactical commander for the La Diana operation, in consultation with Officer Siebert and Sgt. Mayo, made the decision to execute the warrant as a "Category C" warrant. Category C warrants are reserved for high-risk situations where there is a likelihood of violence and are executed by the SWAT team. Standard operating procedure for executing a Category C warrant includes coming in with weapons drawn, ordering individuals to the ground and enforcing compliance if necessary, and handcuffing everyone present. In this case, the police apparently initially made the decision not to handcuff everyone. This concern was raised with Judge McCleve who apparently said that the police should follow standard operating procedure, including using handcuffs on everyone present. The warrant, however, says nothing about the use of handcuffs.

### The Search and Detention

The Salt Lake City Police Department executed the warrant on April 25, 1997, at approximately 3:00 p.m. Agents from the DEA, the FBI, the INS, and the IRS were invited to participate, as were a few officers from Davis County. The intent of the operation was to secure the premises, handcuff everyone present, identify everyone, and then release those who were uninvolved. The investigation had focused almost entirely on controlled buys from persons in the parking lot at La Diana. A total of nine controlled buys were conducted in the parking lot. But the decision was made to raid not only the parking lot, but also to make a "dynamic entry" into the store, restaurant, and tortilla factor at La Diana using the SWAT team. The police were aware that potentially dozens of innocent bystanders would be there during the raid. One of the reasons for inviting along federal agencies was to speed up the processing of the detained individuals so that those innocent persons could be on their way as quickly as possible.

The operation proceeded in two steps. The first step was to secure the premises

by sending in the SWAT team. To accomplish this, 47 SWAT team members came to La Diana in rented Ryder trucks, unloaded from the trucks, secured everyone in the parking lot and inside the store, restaurant, and tortilla factory comprising La Diana by displaying their firearms, ordering everyone present to the ground, and then handcuffing everyone with plastic ties. The federal agencies which were invited did not take place in the actual execution of the search warrant but only in the processing of individuals after the fact. The second step was to process all of the detained individuals by getting their identifying information, including a name and address, and then photographing them for police records.

Approximately 80 people were detained in executing the warrant. The length of their detentions vary. In the end, six arrests were made, including Rafael Gomez for illegally selling Darvon. It is not clear whether anybody was prosecuted. No drugs or weapons were found inside of La Diana.

**Individual Depositions of the Plaintiffs**

What happened during the execution of the warrant remains heavily disputed, as recorded in the depositions of the individual plaintiffs. Below are summaries of the depositions of each of the individual plaintiffs. The summaries focus on what each individual testified happened to them during the execution of the warrant. Additional testimony is included to show the general tenor of the execution of the warrant. Because of the importance of these depositions to the outcome of this motion, these depositions will be recreated at some length.

*Rafael Gomez:* Rafael Gomez is the owner of La Diana. In an affidavit he stated that on the day of the raid he was standing just inside a door when it burst open, striking him in the head. "I was then hit in the head with a rifle and forced to the ground and handcuffed with my hands behind my back." Mr. Gomez also states that the officers used "military style weapons with laser sites pointed at the men, women and children," and that "everyone on the premises was detained, handcuffed, interrogated and many were forced to the ground. All were subject to drug sniffing dogs. The time of the interrogation lasted approximately three hours. All of us were asked to prove that we were on the premises legally." In his deposition, however, Mr. Gomez testified that he did not, in fact, see the dogs sniff anybody. He also testified that he had a car in the parking lot that day but that it was not searched. He did not observe the destruction of any Catholic symbols. Finally, the police did not accuse him of being an illegal alien nor did he hear the police ask anyone else if they were in this country legally.

*Elvia Gomez:* Elvia Gomez is the wife of Rafael Gomez. Mrs. Gomez and her son Sergio had left to the store and were returning to La Diana just as the raid began. When they approached La Diana, Mrs. Gomez testified that the police stopped them and

[Y]elled at us and they pulled us out . . . [m]y son and I. And I didn't know what was happening. I was going, and I hadn't noticed that the people were all laying around there. And when they got us down, they took us out. Right away they put handcuffs on my son, and they told me to lean over by the garbage can. And they threw my son on the ground, they had him against the ground with the gun pointing at him on the ground.

Mrs. Gomez was handcuffed and frisked, and testified that a gun was pointed at her body. Mrs. Gomez testified that the officer who handcuffed her son put his foot on her son and pointed the gun at his head.

Like most of the plaintiffs, Mrs. Gomez also testified that the handcuffs were too tight and that she asked the officers to loosen them but nothing was done.

Mrs. Gomez was then taken to the parking lot where another officer frisked her "briskly." After she was frisked she was taken "with the other ladies that were by the store" where she was left, with the handcuffs on for "about three hours" while being guarded by men with guns. She was finally taken to where other officers were removing the handcuffs from people and taking pictures. When she finally had her handcuffs removed, she was allowed to go inside to find her other two children. She found one of her children, Leonardo, who was eleven at the time, still handcuffed. She took Leonardo outside where his handcuffs were removed.

Mrs. Gomez also testified that she did not see any red laser lights and she only heard the dogs. She was not accused of being an illegal alien, nor did she see the destruction of any Catholic religious symbols. Mrs. Gomez testified that no one kicked her or pushed her.

*Leonardo Gomez:* Leonardo Gomez is the son of Rafael and Elvia Gomez. He was eleven years old at the time of the raid. Leonardo had finished school and had gone to La Diana to help clean, like he did most days after school.

I was in the back sitting there with my little brother, and all I remember is I remember this lady running inside because there was another kid right there playing with us. And I remember his mom running inside and grabbing him and telling him to run, run, and she was like saying run, run to us. And all I hear was the police. I just saw like a whole bunch of guys with masks come inside. They were like, "Freeze, everybody down, down," and that's when I went down to the floor. And then like a lot of men came in there with masks and all dressed in black with machine guns and everything, so I just sat there. And I recall one of them came and tied my hands up behind my back, tied me up with the string handcuffs, plastic handcuffs. And then they took my little brother [Jorge] and I don't [know] where they took him. And then I was just in the back for a pretty long while, just laying there in handcuffs.

And then after that, I needed—they took me out to where the door was so I would go there, and I told the police, I told them, "I really need to go to the bathroom." And he told me, "No, you got to wait." And I told him, "I really need to go. I don't want to go in my pants." And he said a swear word and then he went and talked to another guy that told—and they were talking for a minute. And then the other guy said, "Take him." That's when they took me to the bathroom, and they were in there with me when I went to the bathroom.

Leonardo testified that he did not know that the men were police officers until he was handcuffed. "I thought it was a robbery, but then after that, like when they handcuffed me, I saw it was a raid or something like that." Leonardo also testified that he heard "profanity" like "wetback and you fuckin' dumb ass, you better stay on the ground. And I also heard like 'you fucker' like a lot, being used a lot." For example, when he asked if he could go to the bathroom Leonardo testified that the officer said, "You fuckin' dumb ass." Leonardo also testified that the officer who took him to the bathroom never removed the handcuffs but instead unzipped his pants for him. Leonardo could not recall how long he was handcuffed but it was "a long time ... pretty long. Because after that, I had like all this bruised up because they were so tight, and I was asking them to loosen them a little bit." He did testify that he was on the ground until they took

him to the bathroom, which was about one and a half hours after being handcuffed. Leonardo also testified that he remembered seeing his little brother on the floor "and what got me really upset was they had a big ol' gun pointed to his head onto the floor." Leonardo also testified that he was asked if he was in the country legally.

Leonardo was also asked if he heard other people while he was handcuffed. "Yeah, I heard like yelling, like this lady was yelling a lot because she was pregnant and they threw her and it was my aunt [Maricela].... She was screaming in Spanish that she was in pain and it really hurt, and that's when they tied her up and threw her when she was pregnant."

Leonardo testified he did not remember seeing any dogs. After at least an hour and a half, according to Leonardo, he was finally taken to the parking lot where his picture was taken and he was released. Leonardo also testified that "ever since [the raid], I got like my hands are always hurting and everything. And then I used to have like nightmares from that same day."

*Jorge Gomez:* Jorge Gomez is also a son of Rafael and Elvia Gomez. He was six years old on the day of the raid.

> On that day me and my brother [Leonardo], and I think some kids were playing. And we just saw someone go in and say, Everyone on the ground. And after that they moved me like in front of the counter where they charge. And they like—a while passed and I had to go to the restroom. And I asked my brother-in-law [Rogelio Gomez] to tell them, but when I was like telling him, some guy like pointed a gun at me like I was going to do something. At first he didn't want to let me go to the bathroom, but a while passed and he said, All right.

Jorge was not handcuffed. He was placed on the floor like the other detainees, and

testified that a gun was pointed at his head. He also testified that it was "about three or four hours" between the time he was put on the ground and when his mother came in to get him. Jorge did not see any dogs and was not asked about being an illegal alien. He testified that he was not kicked or pushed and did not see anyone else pushed. He also testified that he did not hear any swearing.

*Sergio Gomez:* Sergio Gomez is also a son of Rafael and Elvia Gomez. He was nineteen on the day of the raid and was working at La Diana. He arrived with his mother at La Diana shortly after the raid had begun.

> [T]he first thing, you know, that came to my mind was that the police came here to help us to catch all the bad guys that were outside selling drugs. And then we, you know, we saw one of the SWAT team, or whoever he was, a police officer, and we—they told us to back off, to go away, but we told them we were the owners, and at that point they told us to—that's when they grabbed me and threw me to the floor.

Sergio was immediately put on the ground and handcuffed and testified that a gun was aimed at his head. He testified that the handcuffs were too tight and that he had shoulder and wrist pain for several weeks afterwards. He had asked the officers to loosen them but they refused.

After some time, Sergio was taken to the parking lot where the processing was being done. He testified that the detainees were being harassed about being illegal and were being threatened with deportation; the police were saying "All you wetbacks, all you wetbacks, you know, just those words." He was then taken to the office in La Diana because the IRS wanted to speak to him concerning the La Diana's business records.

Sergio was also asked if La Diana had been having problems with drug dealers and testified that they had been trying for some time to get the police to come and get rid of the drug dealers in the parking lot.

> That's why we called like two or three times every day. The police would show up. [The drug dealers] would just leave for a couple of minutes or go inside a store and they would only show up, but never did anything. Except for one time an officer actually went into, you know, I called him up, I said, you know, "We have a problem. We have some guys in the restaurant that are, you know, they're counting all their money and I need you to help me and, you know, get him out." So I can't remember the name, but it was one time when a police officer showed up and went up with me and we told him that he needed to leave.

When asked if J.D. ever called the police Sergio responded:

> Yes, almost every day. I mean, either J.D. would call them or Graciela or I or even my dad would call them up and say, "You know what, we have this problem, we need your help, we need to take care of it." And they would just come and, you know, don't do anything. They just drove by, the drug dealers would just either go inside or go out to the park or whatever, and after the police had passed, just come back again and harass our customers and, you know, just sell their drugs there.

*Leticia Hernandez:* Leticia Hernandez was an employee of La Diana. She was pregnant at the time of the raid. She had a miscarriage about eight days after the raid, which she attributes to the trauma she suffered. Leticia was in the factory when the raid began and was handcuffed and put on the floor and also testified that a gun was pointed at her. She testified that she was handcuffed for about three hours. Leticia was not placed on her stomach but was allowed to sit down. She also complained that the handcuffs were too tight and were causing her to bleed. Her handcuffs were loosened. Her bag was searched and there is some dispute about whether she consented. Leticia testified that she was not kicked and did not see anyone else kicked but was "pushed ... really hard because they threw us down by the entrance to the street."

*Martin Gutierrez:* Martin Gutierrez was a customer having lunch with his co-worker, Carlos Perez, at La Diana on the day of the raid. Police officers entered the restaurant and ordered everyone to get on the ground. "All of them at one time said for us to get down. And the one that was telling us—the one who was telling us to get down also was the one who told the waitress to get down. And she didn't understand, and so he pointed the canon to her—I think it was an M-16, I don't know. And his gun had infrared, and he would point it at her chest and her head." Mr. Gutierrez got on the floor and was handcuffed. He testified that after about 45 minutes the people in the restaurant were told to get up off the floor and then they were sat down and asked to produce papers indicating U.S. citizenship. "And they took our wallets, and they looked in our wallets." Mr. Gutierrez did not testify as to how long he was handcuffed or when he was released.

*Graciela Zamora:* Graciela Zamora was working as a secretary at La Diana on the day of the raid. She was in her office with her daughter when the raid began. When she heard people running up the stairs she became frightened and locked the door and leaned against it.

> I felt that they were kicking it in the back of me like this. I didn't know what to do at that time. And the noise and

the shouting were still going on outside. It was a very frightening moment for me, I did not know what was happening. And I heard a shot outside. And I was really scared then. I was so scared I ran from the door and my daughter took the lock off quickly from the door. And when I heard the shot I thought that they had killed somebody outside. And then the men, they came in. They were covered, their faces were covered. They were running, they came in running and they pushed us down like this towards the back, and they threw us to the floor. I saw them in an instant. I saw that they were covered. You could only see their eyes.

And they put us against the floor with their hands on my hair like this. They grabbed my hair like this. I was crying, I was shouting, I was shaking. And my daughter the same, we were both in the same way. And she would shout, what happened, what happened? And they said, shut up, shut up. And the only thing that I saw was a little red light on the floor. And all that I did was close my eyes, I though they were going to shoot me. And then some more minutes went by, we were on the ground with my daughter and they tied us up like this. . . .

And then about half an hour went by, and they got us up and they sat us down like this. And then someone came in, this person came in and they did not have the face covered up. I think he was the boss of the men that were there with us. And he said, okay, this is very serious, okay. And he grabbed me by the arm and he took me to the hallway over here in a corner and he started talking to me. And he said, tell me where the weapons are. Where is the drugs?

Graciela was held and questioned for about one hour. She testified that she was handcuffed for one and a half hours and that her daughter was crying because the handcuffs were too tight. There is also a dispute about whether Graciela consented to have her purse searched. She was asked if she gave permission and responded: "Well, permission, permission I'm not sure. They asked for my identification, my hands were handcuffed and I said, there's my bag." The police looked through her identification, took her picture, and then removed the handcuffs and told her she was free to leave.

Graciela also testified about a picture of Our Lady of Guadalupe, a Catholic religious icon, which was broken by the police during the raid. "[T]hey took it with their weapons, they went like this. Maybe they were searching for something behind the picture, and the picture dropped and it broke. . . . I think it was intentional. It was with violence that they went like that . . . I saw how they threw the picture . . . It had a glass, and it's a large picture and so when they went like that, then it dropped and broke."

Graciela testified that she was not kicked or beaten and did not see anyone else get kicked or beaten, but when she saw her boss, Rafael Gomez, "You could see that he had been beaten." Graciela also testified that she did not have any physical injuries, "But psychologically, yes. I would cry at night and my daughter also."

*Jerado Ramirez Rodriguez:* Jerado was working in the kitchen at La Diana on the day of the raid. The officers came in and ordered everyone to the ground. Jerado testified that he did not understand English and did not understand what they were saying. "And then one came over and he threw me to the ground. And one held me down on the ground and was pointing at me with a gun. I don't know enough about guns to know what kind it was. And he didn't have the handcuffs, so

another one came with the handcuffs. And that's when I know that they were the police, and that the police was coming." Jerado testified that he was on the floor handcuffed for at least twenty minutes and was then taken to the store portion of La Diana where he was left, handcuffed, for two to three hours. He was then taken outside where his picture was taken and he was sent home.

*Maricela Gomez:* Maricela was working as a cashier at La Diana on the day of the raid. She is the sister of Rafael Gomez. She was asked to describe what happened on the day of the raid:

I went out from La Diana and I went outside, and I was going outside to the parking lot and I was going to the other building, which is the tortilla factory. And then I saw that two trucks, one on one end and one on the other end, stopped. And some men got out, running and yelling. They had guns.

I wanted to go back in because I thought that they were there because of the people that were outside, because a week or two before there were a lot of people from like the shelter that were outside. And I—I felt confused because I thought, well, maybe they're here because of them, so I wanted to go back.

And as I was turning to go back, that's when a man and a woman—they were both—they grabbed me, one by the hand and one by the hair, and they threw me down. And I remember that someone put their—their foot on my head over here because—I don't know. I was so—I was so scared. So I told them that I was pregnant, because I was pregnant two and a half months, and they didn't listen. And anything that I would say, they would have me be quiet. Anything that I wanted to say, they would have me be quiet.

So I don't know. They held me up for some time. I don't know exactly how long, but they had me there for some time on my belly with my hands tied up on my back. And from there—from there they took me to another part where other people were there—where there were other people that were kneeling, and they had me there kneeling. And I was—and I was the same as them, tied up. That's how they had me, tied up. I think I was one of the—some of the last people that they untied.

Maricela estimated that she was handcuffed for at least three hours and was one of the last ones to be let go. Maricela's baby was born in November of 1997 and has had problems with speech since her birth. Maricela attributes the problems to the raid. "... I was really scared and because I was that scared on that day and I was pregnant, and I think that she was affected by it because I was pregnant and I was two and a half months pregnant then." Maricela, however, never talked to her doctor about the raid. Maricela's purse was also searched. When asked if she gave permission she said, "They just told me that they were gonna look in my purse. So they grabbed it and they looked in." Maricela does not remember if she was kicked, but did testify that she saw others kicked and shoved.

*Ester Reyes:* Ester is the aunt of Elvia Gomez. She is currently 66 years old. She was working at La Diana on the day of the raid. Ester was asked what happened on the day of the raid:

At that day I was on my break and I was standing by the door. When I saw that these people got—came out of—these hooded people came out of a yellow truck. And they were coming, pointing at us with rifles on their hands. And they went into La Diana, and they told us, All of you who are here, stay here and go on your stomachs, and put your hands on your back. And then a

man, he was pointing at us with the rifle.... And then they handcuffed us like this as if we were criminals. And they had us handcuffed for almost three hours. And I told them that they needed to take the handcuffs off because I wasn't—I was feeling really—I wasn't feeling good. And what they did was they had me sit down, and they had me sitting down until 5:00, and then they took off the handcuffs.

Ester's break was around 2:00, so she estimates she was handcuffed for close to three hours. Ester was not asked about her immigration status. Ester testified that she was not kicked or shoved and did not see anyone else get kicked or shoved.

*Fidel Salazar Valdez:* Fidel was working as a cook at La Diana on the day of the raid. Fidel was asked to describe what happened to him on the day of the raid:

When I noticed that something was going on there, I heard that there was a lot of shouting. And I went by the window and I looked out and I saw two men that had their heads covered. Their face covered. When I saw that, I saw that the people who were eating, they would throw them on the floor with their rifles....

When I saw that, I ran to get out of the kitchen. And when I was getting out of the kitchen through the door— When I was going out through the door, out of the kitchen, a police officer hit me here with the rifle on my chest.... When I was on the ground he put a foot on top of my back. And then he grabbed my hands and he put them on my—on the back.... In that position I was for about a half an hour, on the—down.

Fidel was asked to provide residency papers. Like the others in the restaurant, he was moved to the store where he was left for some time. Fidel testified that he was handcuffed for three hours. He also complained about the handcuffs being too tight and "hurting my arm a lot." Fidel also testified that his car was searched. "Because when they got me free and I was free and they told me to go home, an officer took me with my hands up like this to the car. And when we got to the car he told me he was going to search my car. And he sent the dog in the car."

*Cory Burt:* Cory Burt was a customer in the restaurant at La Diana on the day of the raid. He and two friends had just sat down to order when the raid began and officers came in yelling for everyone to get down. "I says, 'You've gotta be shittin' me.' That's the first thing out of my head—out of my mouth ... And then I'm just getting down slowly, you know.... I got down on the—on the floor, and I said—I said, 'What's going on here?' He said, 'Just get down. Just get down.' I say, 'Take it easy.' And he pushes the barrel like, 'Get down. I said get down.'"

Q. He put the barrel in the back of your head?

A. Yes, to push me, get down. He said, "I told you get down."

Mr. Burt was then handcuffed and left on the floor for 15 to 20 minutes. After some time a polaroid was taken and taped to his chest. He was then taken outside where another officer asked if she could search his car. Cory responded " ... [I]f I say no, you are going to pull me over down the street and run through my car anyway. She said, 'That's right.' ... So I said, 'Go ahead then.' I had no choice." Mr. Burt's deposition does not reveal how long he was handcuffed or kept at the scene.

*Carlos Trevizo:* Carlos is a self-employed contractor who was doing some work outside of La Diana on the day of the raid. Carlos had left to get some road base in a dump truck and had just returned and was getting ready to dump the road base when the raid began.

A. .... I went in and backed the dump truck to this point, raised the bed, they went by. They stop about 20 feet from me when I have the dump all the way to the top, 2,500 RPMs when I was supposed to go forward, when I see the machine gun in front of my face just like that. Get out.

Q. So you're in the cab of your truck?

A. Uh-huh. I have to dump 2,500 RPMs to go forward unloading, they're going to.... The way you do, you raise the bed up, the dump truck, your raise your bed up, you're here. When this opened, the gate, you have chains in the back of the dump truck, it opens about that much only. So when you go forward with the bed up, you don't look forward, you look back, okay? Because you look into the mirror in the back. You're not looking in front of you because you know there's nobody in front of you because you know there's nobody in front of you for the load that you have. If somebody comes and park right there, I hit it in a hurry. I have one of my workers right in front, so in that particular time he went to the back, when I did that, I see the machine gun right in front of me.

Q. I'm sorry, the machine gun is right in front of you?

A. Right over here.

Q. On the ground, on the street level?

A. Right over here was the van, right over here, about 30 feet, 30 feet from my dump truck. If I was to release that clutch, everybody would have been dead in that Ryder truck, everybody, because it's too heave. If I release that clutch in that truck the way they told me to, raise my hands, to keep it a—to get out of the truck, I can jump easy out of the truck, and the hell with it. But I had to relax, and I raised my hands up and with my knee I pushed the gear out of my truck....

Q. What did the person with the machine gun, what did the person say to you?

A. You want to know the truth? The hard words?

Q. Exact words.

A. Turn the fuckin' truck off, you cock sucker mother fucker. I think it is that—I know the cop. I know him. I know where he lives. I know every single thing of him. [His name is] Bob....

Q. Well, what kind of things did they call you?

A. From one cock sucker mother fucker to the rest, fuckin' Mexican son-of-a-bitch, get the fuck out of the truck, turn the fuckin' truck off, you son-of-a-bitch, you don't understand fuckin' shit, keep your fuckin' hands up, don't move, you son-of-a-bitch.

Carlos raised his hands and knocked the truck out of gear with his knee. The officers then approached. "Opens the door, grabbed me and pushed me out of the dump truck, dragged me out of the dump truck, shake me around, hit me against the frame of the truck, pushed my back...." Carlos was taken to the ground and handcuffed. He was injured in the process. "I asked for an ambulance. They told me to go fuck myself.... They kick me about one, two, three, four times." Carlos also testified that the police searched his dump truck and another truck he had there. Carlos testified that he was handcuffed for about two hours and then taken to have his picture taken at which time the handcuffs were removed.

Carlos had surgery on his right shoulder as a result of the raid and testified that he still needs two other surgeries as a result of the injuries he suffered.

*Cynthia Rodriguez:* Cynthia Rodriguez was a customer at La Diana on the day of

the raid. She was asked during her deposition what happened to her on the day of the raid:

I had gone to the store to buy bread, Mexican bread. I was pregnant. I was around four to five months pregnant, and I was craving for a Mexican meal, and we needed to go and buy Mexican bread. And as soon as we arrive there, we—I remember that I opened up a bag so I could be able to put the bread inside. My husband and another friend were on the outside in the car. I guess they just didn't want to get off, so I was the only one who got off.

And as soon as I went inside the store, there was a lot of men, policemen, with—you couldn't see their faces or anything. They had laser guns, and I was just shocked. I didn't do anything. I stood there. They were telling everybody to just drop down. I was shocked, and so I didn't do anything until a policeman got near me. And he held me by the back, and he pushed me towards the—towards the floor.

After that everybody—a couple people were running around. A couple of people were just stood like me, just steady. After that I remember telling the policeman that I was pregnant. I kept on telling everybody, "Couldn't I please go and put my belly to the side?" They told me, "No. Be quiet. There's nothing you can do."

A lot of these people—since they seen me that I was talking to them in English, a lot of people tried to communicate with me and told me, "Please, can you please let them know that I have my children at home? It's gonna be time for my children to get off from school." There was a—there was a lady. I think she was in between 50 to 60 years old, I would say. She just kept on begging me to please let them know that her kids were going to be home from school and that she needed to be home and if this was Immigration, and I didn't know what was going on. I was just like I didn't even know myself.

And so I kept talking to them in Spanish. The more I was talking to them, the more they would tell me to shut up, that I needed to talk to them, for me to be quiet. And they kept saying to other people as well, "You need to be quiet. You need to shut up."

And there was—there was kids there.

After they put us on the ground, I remember that they put our hands to the back and they put the plastic handcuffs, I would say, yeah, like plastic things. And when he—when the policeman put the handcuffs on me, I told him, "Can I at least please roll to the side?" He said, "No," again, "You just need to be quiet. This will only take a couple of minutes." After that I remember that we stayed on the floor for at least half an hour. I was with my belly down for at least half an hour.

Then after that, after the half an hour, one of the policemen actually took off his mask and asked me if I was pregnant, and I told him, "I have been saying that for the past half hour. Can you please let me put my belly to the side?" What he did was he grabbed a chair and he lifted me up and he put me on the chair. He didn't take the handcuffs off me. He just put me on the chair. Then I was sitting there for a period of time, and they were asking all these people names, identities.

The lady that I think I'm talking about, the one that was 50 years old, they grabbed her purse. They opened it up. They were trying to get IDs.

After that I remember that, since they couldn't actually communicate with the people because of the people that didn't actually even know what to answer or what to say, they started asking

who was a person that was bilingual. And I was, I think, the only one, so I started—I ended up translating for everybody that was there. So I was, I think, the last one to get off from that incident because I needed to translate for everyone. They did not have anybody that spoke Spanish in there. I was the only one that was bilingual and was able to communicate with both.

So they asked for date of birth, full names, and I remember that I asked one of the agents—I said, "Why are you people asking all of this information?" "It is just for security purposes, for security purposes, and we like to know if you guys have any type of criminal background. If so, we will notify you and you will go to jail."

So, myself, I thought, well, I don't have a criminal record, so I'm okay. I'm just gonna try and wait until this is done. I was pretty mad because of all that happened, and I was sore from my belly. They just didn't do anything at all. I was complaining for the whole time I was there, and they didn't do anything at all.

After that they told us they—to go ahead and give them our IDs, and I remember that I had mine, I think, in my purse. So I was ready to grab it, and he snatched it off—out of my hand, and he started getting names of everybody. And then they just—after a while they just let us go because, according to them, we didn't have any type of criminal background.

Cynthia testified that she interpreted for all of the approximately 20 people who were detained inside the store. She also complained about the tightness of her handcuffs and said "everybody kept on complaining they were too tight, they were too tight, and nobody would do anything about it." She had marks on her wrists for two days afterwards.

Cynthia's baby was born several months later with heart problems and had to have surgery. He has also required speech therapy. Cynthia believes the raid had something to do with her child's health problems.

*Florentino Rodriguez:* Florentino is the husband of Cynthia. He was in his car in the parking lot waiting for his wife when the raid began.

A friend and I were sitting in a car, when we saw that two trucks came in. And they got off the trucks and they went inside, and you could hear yelling and you could hear some shots. And they had not seen that we were inside the car. But when they did, they had— they pointed their guns at us and they had us get out and they threw us on the ground.

Florentino was then handcuffed for about an hour, according to his testimony. His picture was taken and he was released.

*Other Plaintiffs:* Plaintiffs Carlos Perez, Maria Del Carmen Cruz, Carmelo Cruz, Laurentino Rodriguez, Ashley Rodriguez, Silvia Rodriguez, Goria E. Villalobos, Pedro Campos, Jiverto Baptista, and Rogelio Gomez failed to appear for their depositions. Plaintiffs Juan Carlos Rovles and Antonio Aranda appeared for their depositions as scheduled, but there was no court reported. Mr. Rovles and Mr. Aranda left before the court reporter arrived. The court has been presented with no evidence concerning these plaintiffs.

### DISCUSSION

#### Plaintiffs Who Failed to Appear for Their Depositions

As a preliminary matter, the court hereby GRANTS summary judgment in favor of all of the defendants against the plaintiffs who failed to appear for their deposition, including Carlos Perez, Maria Del

Carmen Cruz, Carmelo Cruz, Laurentino Rodriguez, Ashley Rodriguez, Silvia Rodriguez, Gloria E. Villalobos, Pedro Campos, Jiverto Baptista, and Rogelio Gomez. At oral arguments the defendants stated they were not moving for summary judgment against plaintiffs Juan Carlos Rovles and Antonio Aranda since they did in fact appear for their depositions.

These plaintiffs were scheduled to appear for their depositions on July 30, 2004. They have given no reason for their failure to appear. This case has been pending for more than five years. A two-week trial is scheduled to begin in less than one month. The court is now at the summary judgment stage, and these plaintiffs have failed to present any evidence to the court supporting their individual claims. As such, there exists no genuine issue of material fact with respect to these plaintiffs. Summary judgment in favor of the defendants is therefore appropriate.

These plaintiffs contend that it would be unfair to dismiss their claims for failure to appear for their depositions since the defendants were allegedly not very cooperative in scheduling depositions. Whether this is true or not, the plaintiff did not present this dispute to the court in a timely fashion when depositions could have been rescheduled. More important, regardless of their failure to appear for their depositions, these plaintiffs have not put forward any evidence in their favor. Rule 56(e) provides that:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule,

must set forth specific facts showing that there is a genuine issue for trial.[5] An affidavit from each of these plaintiffs detailing what occurred to them on the day in question might have been sufficient to create a genuine issue of material fact. Without such an affidavit, however, summary judgment in favor of the defendants is appropriate.

As an alternative reason for granting summary judgment as to these plaintiffs, the court notes that Rule 37 of the Federal Rules of Civil Procedure gives the court the right to dismiss a cause of action when a party fails to appear for a properly noticed deposition. Dismissal, of course, should not be the first choice of the court.[6] In *Ehrenhaus v. Reynolds*, the Tenth Circuit set forth five factors courts should consider before dismissing a plaintiffs complaint for failure to appear for a deposition: (1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions.[7]

██ Applying these factors demonstrates that dismissal is an appropriate sanction in this case. As a preliminary matter, the court notes that this case has been on the docket for more than five years. These plaintiffs were fully aware of the discovery deadlines imposed in this case and fully aware of the quickly-approaching trial. They have given no reason for their failure to appear nor did they request additional time. Whether or not the defendants were cooperative in scheduling depositions is irrelevant. The depo-

---

5. Fed.R.Civ.P. 56(e).

6. *See Ehrenhaus v. Reynolds,* 965 F.2d 916, 921 (10th Cir.1992).

7. *See id.*

sitions were scheduled and the plaintiffs were properly noticed, but they failed to appear without explanation. Because of this, the defendants have had no chance to depose these plaintiffs and prepare a defense. Moreover, the dispositive motions cutoff date has passed, so that the defendants were unable to rely upon the depositions of the plaintiffs in this motion for summary judgment. Given the broad claims in the complaint, deposing these plaintiffs was essential to allow the defendants to outline their defense. The first factor, prejudice to the defendants, is clearly met. The court could, of course, reopen discovery and reset the dispositive motions cutoff. This, however, would cause serious disruption to the court's docket. A two-week trial has been set and is less than one month away. Further, reopening discovery would come at great monetary costs to the parties who have already spent five years in litigating this case. The second factor, therefore, also favors dismissal. The third factor, culpability of the litigant, also favors dismissal. These plaintiffs have given no reason for their failure to appear at their deposition. In response to the defendants' motion for summary judgment, the only argument raised in favor of these plaintiffs is that the number of depositions granted to each side was unfair. Whether this is true or not, it does not excuse the failure to appear at a properly noticed deposition. The culpability, therefore, lies with the plaintiffs. As to the fourth factor, the court did not explicitly warn the plaintiffs that failure to appear for a deposition could result in dismissal. The plaintiffs, however, were well aware of the need to put forth evidence to rebut a likely motion for summary judgment, and were well aware of the approaching trial and approaching deadlines. It should have been clear that failure to appear would cause disruption in

a case that had already been pending for five years. Given this, the plaintiffs should have been aware that the failure to appear could have serious consequences. Finally, this discussion makes it clear that lesser sanctions could not be imposed without serious disruption to this case. A two-week block of free time would have to be found on the court's calendar, likely pushing the trial back several months. Discovery would have to be reopened and a new motion for summary judgment would likely be filed. Given this, lesser sanctions would not provide the defendants with an appropriate remedy in this case. Dismissal is therefore appropriate under the *Ehrenman* factors.

### Liability of the Individual Officers

Before proceeding to the merits of plaintiffs' claims, it is necessary to determine who is liable for any violation of the plaintiffs' constitutional rights. The officers involved contend that they are protected by qualified immunity because the plaintiffs have failed to allege the personal participation of specific individual officers in alleged constitutional violations. Each officer has been sued in his individual and official capacity.

 The defendants phrase the salient issue in terms of qualified immunity. In fact, the salient question is simply one of evidence. "To prevail on a claim for damages for a constitutional violation pursuant to 42 U.S.C. § 1983, a plaintiff must establish the defendant acted under color of state law and caused or contributed to the alleged violation."[8] It is not merely enough for a plaintiff to allege a violation. The law is clear that in the Tenth Circuit that an individual plaintiff must allege which officer or officers personally participated in the violation of

---

8. *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir.1996).

that plaintiff's rights. "The plaintiff must show the defendant personally participated in the alleged violation ... and conclusory allegations are not sufficient to state a constitutional violation." [9]

In *Durre v. Dempsey*,[10] the Tenth Circuit held that the district court properly dismissed a section 1983 claim against several officers where the plaintiff directly alleged only the involvement of one of the officers. "Plaintiff failed to allege the personal participation of any of the other defendants in the incident underlying his claim ... In order to be liable pursuant to § 1983, a defendant must have personally participated in the alleged deprivation." [11] In *Jenkins v. Wood*,[12] the court rejected an excessive force claim against an officer where the plaintiffs "brought forward no evidence indicating Agent Sabel participated in the use of excessive force *against them personally.*" [13]

■ The plaintiffs made an effort to identify the officers who participated in the raid but have been unable to match up claims of plaintiffs against specific officers. A typical example is found in the deposition of Cynthia Rodriguez:

Q. Do you know if the officer who handcuffed you was the same officer who took his mask off?

A. There was—all of them were in masks, so I wouldn't be able to know which is which.

Part of the problem here is that the allegations in the plaintiffs' complaint are overly broad. The complaint continually states that "all" of the officers were engaged in certain violations, an allegation that is facially unplausible. Similarly, the complaint also overstates the damage to the plaintiffs. For example, the complaint states that "all" of the plaintiffs cars were searched. In fact, several of the plaintiffs have testified that their cars were not searched. In addition, the complaint states that "all" of the plaintiffs were falsely accused of being illegal aliens. Some of the plaintiffs, however, have testified that they were not accused of being illegal and were not asked about their legal status. Moreover, those who state that they were accused of being illegal aliens and that their property was searched cannot identify which officers engaged in the allegedly illegal activity.

This creates a dilemma. If constitutional violations occurred, why should plaintiffs have no redress simply because the officers who committed the violations wore masks and could not be identified? One option is to shift the burden to the defendants to identify the participants. If there were evidence that the identity of officers has been concealed for the purpose of preventing suit, this approach might be appropriate. The Ninth Circuit faced this situation in *Dubner v. City and County of San Francisco.*[14] In that case, the plaintiff had been arrested without probable cause and filed suit against the two officers she believed had arrested her. The district court dismissed the case because, although the City had a practice of not identifying the arresting officers on the arrest report which the court felt was deliberately designed to frustrate potential plaintiffs, the burden was still on the plaintiff to identify the officers. The Ninth Circuit disagreed, holding that since the plaintiff "did everything she possibly could to identify the arresting officers" the court could "reasonably assume she had named the right offi-

9. *Id.*

10. 869 F.2d 543 (10th Cir.1989)

11. *Id.* at 548.

12. 81 F.3d 988.

13. *Id.* at 995.

14. *See* 266 F.3d 959 (9th Cir.2001).

cers or [that] the City would come forward with the name of the officers who actually arrested her. By shifting the burden of production to the defendants, we prevent this exact scenario where police officers can hide behind a shield of anonymity and force plaintiffs to produce evidence they cannot possibly acquire."[15]

In a case of only one plaintiff and two defendants such an approach might be feasible. However, in this case we have 19 plaintiffs and at least 17 Salt Lake City officers. In addition, agents from Davis County, the FBI, the DEA, and the INS participated in the raid. Moreover, each of the plaintiffs likely encountered more than one plaintiff and each plaintiff likely encountered more than one of the defendants during the raid. It is simply impracticable to shift the burden in this case. More important, it was made clear in the pleadings and during oral arguments that the plaintiffs did not do everything they could have during discovery to discover the identities of individual officers. The plaintiffs, for example, could have deposed the officers with the plaintiffs present and asked the plaintiffs to attempt to identify which officers they had contact with. Plaintiffs could also have requested discovery earlier in the process. Instead, this suit was not filed until two years after the events occurred, and discovery did not begin for almost another five years. In total, almost seven years had passed before plaintiffs began conducting discovery, and little was done to learn the officer's identities.

This case is similar to *Taylor v. Brockenbrough*,[16] an unpublished decision from the Eastern District of Pennsylvania. In that case, Carlos Taylor was walking home from work when he was stopped by two police officers. Taylor was ordered to stand facing the wall. The officers searched Taylor and then one of them suddenly struck Taylor in the back and the side of his torso, causing him to fall to the ground. While on the ground, the officer kneed Taylor in the lower back, causing Taylor to hit his head against the wall. Because Taylor was facing the wall he was unable to get a good look at the officers. Taylor, however, used police logs and a license number from the police car at the incident to identify six officers who were on duty in the area at the time of the incident. He then named all six officers in his complaint and relied on *Dubner* to argue that the burden should be shifted to the defendants. The court held that "because neither Taylor nor any witness has been able to identify the exact police officer responsible for Taylor's alleged beating, there is no evidence upon which to hold any of the defendants liable for the alleged violation ..."[17] The court distinguished *Dubner* because the evidence in *Dubner* showed that the policy of the city was specifically intended to thwart identification of arresting officers.

In this case, there is no evidence of any policy intentionally designed to thwart the identification of officers for the purpose of avoiding suit. The SWAT team does wear masks, but this is a common practice for all SWAT teams and apparently has safety purposes. Moreover, as was noted above, the court cannot say that the plaintiffs made a sufficient attempt to identify the officers individually.

The facts of this case suggest an additional reason for not shifting the burden: the plaintiffs have other options open to them. Where a large SWAT team engages in a raid where constitutional violations are allegedly widespread, plaintiffs

15. *Id.* at 965.

16. 2001 WL 1632146 (E.D.Pa.2001).

17. *Id.* at *2.

can pursue a section 1983 suit based on supervisory liability or on lack of training. Widespread constitutional violations during a raid would suggest evidence of improper training, or of supervisory liability. Plaintiffs, however, have alleged neither. Along these same lines, perhaps the best option for plaintiffs in a case like this is to sue the municipal entity. The crux of plaintiffs' complaint in this case is that the manner of execution of a search warrant was unreasonable. As noted below, defendants contend that this warrant was executed pursuant to standard operating procedure. Where a warrant is executed pursuant to standard operating procedure leading to widespread constitutional violations, there is likely to be evidence of a practice or policy of the municipal entity. The potential liability of the City in this case is discussed below.

This court does not rule out the possibility that, in the right situation, shifting the burden to the defendants would be an appropriate response to the problem of identifying which particular officer violated a plaintiff's rights. For example, the court can imagine a situation where a small group of officers observes one of the officers engage in excessive force. If a plaintiff in such a case were unable to identify which particular officer committed the constitutional violations, and if the other officers circled the wagons and refused to identify the officer, shifting the burden under something like a joint tortfeasor theory might be appropriate. That issue, however, is not before the court, and such action in this case is simply unfeasible.

In the future, there may be a case where a city's policy of providing anonymity to officers could lead to constitutional violations. Officers might have no fear of personal liability because of the anonymity provided by their employer. The employing municipality might feel shielded from liability because if an anonymous officer crosses the line, the city is protected by the fact that the officer was acting outside of the policies of the city. As a result, the incentive in such cases is for the city to provide anonymity. How the court should handle such a situation need not be decided now. In the appropriate case, the plaintiffs should have the opportunity to present to the jury arguments that the city's policy of providing anonymity to its officers led to constitutional violations. This would remove the incentive to provide complete anonymity to its officers. Perhaps the court should shift the burden of identifying which officer was involved to the defendants in such a situation. But such an approach should be a fallback position for those cases where it is clear that the plaintiffs have made every reasonable attempt to identify the offending officers without success. In this case, the court cannot say that the plaintiffs have made such an attempt.

The appropriate outcome here is to grant summary judgment in favor of the individual officers. Beyond the failure of the plaintiffs to identify the personal participation of the named defendants, there are good reasons here to grant summary judgment in favor of the individual officers. First, plaintiffs have not shown that officers Phil Kirk, Amy DeSpain, or Ruben Ortega had *any* involvement in the alleged violations which occurred on the day of the raid. It is alleged that Officer Kirk called local news before the raid. Plaintiffs have failed to show, however, how this may have violated their constitutional rights.

In addition, as noted above, the constitutional violations plaintiffs allege are largely the result of the investigation and the decision of how to carry out execution of the warrant. With the exception of Officer Siebert and Officer Steed, the officers who participated in the raid had no part in the investigation or in obtaining the warrant

or in deciding how to execute the warrant. The Declaration of Officer Clark Russell Amott is typical: "I was informed on April 25, 1997, the day of service, that a warrant service would be conducted on La Diana. I had no role in any of the investigation leading up to the request for the warrant. I had no part in determining how the warrant would be served." The Declaration of Officer James Bloomer states: "About 2 hours before the raid I attended a briefing. I was told I would have outer containment on the north side of the building along with sever other officers. I was told all persons inside the area were to be handcuffed and once the situation was determined to be stable persons not needing to be detained would be released." By all accounts, the warrant was executed according to "standard operating procedure." Thus, if constitutional violations occurred in the execution of the warrant, the blame should not fall on the shoulders of the officers who took no part in the planning or the execution of the warrant. There is an "evidentiary presumption that when a police officer carries out a search based on a warrant it is a good faith search." [18] The court therefore grants summary judgment in favor of the officers named in their individual capacity.

Plaintiffs also allege that Officer Siebert should be held liable for false statements made in an affidavit to obtain the search warrant. That issue is discussed below. The state law claims against the individual officers will also be discussed below.

■ Inasmuch as the individual defendants are also named in their official ca-pacity, the court grants summary judgment in their favor. "[I]mmunity under the Eleventh Amendment remains in effect when state officials are sued for damages in their official capacity ... As the Supreme Court has noted, suing officials in their official capacity 'represents only another way of pleading an action against the entity of which an officer is an agent.'" [19]

In sum, summary judgment is granted in favor of the individual officers on all claims.

### Liability of the City

■ Plaintiffs have also sued Salt Lake City. A city cannot be held liable for constitutional violations committed by its employees based upon a theory of respondeat superior or vicarious liability. A city can be held liable, however, when the constitutional violation is the result of "its policy or custom." [20] As the Tenth Circuit has stated, "[I]t must be shown that the unconstitutional actions of an employee were representative of an official policy or custom of the municipal institution, or were carried out by an official with final policy making authority with respect to the challenged action." [21] To establish municipal liability, therefore, "a plaintiff must show (1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged." [22]

Defendants point to several City policy statements in an attempt to shield the City from liability. For example, Police Policy Section 4–06–01.02 generally states that the police have the right to detain a sus-

**18.** *Jenkins,* 81 F.3d at 995–96 (citing *United States v. Leon,* 468 U.S. 897, 922, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)).

**19.** *Eastwood v. Dep't of Corrections of Okl.,* 846 F.2d 627, 631 (10th Cir.1988) (quoting *Monell v. Dep't of Social Services of City of New York,* 436 U.S. 658, 690 n. 5, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

**20.** *Pietrowski v. Town of Dibble,* 134 F.3d 1006, 1009 (10th Cir.1998).

**21.** *Seamons v. Snow,* 206 F.3d 1021, 1029 (10th Cir.2000).

**22.** *Jenkins,* 81 F.3d at 993.

pect "so long as the detention and questioning is reasonable in light of the circumstances." Section 4–04–04.03 generally states that searches "must be conducted in a reasonable manner." These policy statements do little more than instruct officers to follow the constitution. To be fair, some of the policy statements are more definitive. But those statements do not cover the conduct at the center of this lawsuit. A city cannot shield itself from all liability for potential constitutional violations by the simple expedient of enacting a general policy statement that it is the city's policy to not violate constitutional rights.

Consistent with this reasoning, the Supreme Court has held that cities may be held liable for constitutional violations based on a single incident. In order to establish liability the plaintiff must show that the incident involving the alleged constitutional violations occurred as the result of the decision of a municipal officer with policy-making authority.

> In the case where a plaintiff seeks to impose municipal liability on the basis of a single incident, the plaintiff must show the particular illegal course of action was taken pursuant to a decision made by a person with authority to make policy decisions on behalf of the entity being sued.[23]

In other words, while the "policy" of the City "often refers to formal rules or understandings" which may be committed to writing, it can also be nothing more than a particular course of action followed in a single incident.[24]

> [A] government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt the particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood.[25]

This is only the case, however, "where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." [26]

The testimony in this case reveals that the actions taken during the execution of the warrant were according to "standard operating procedure." Officer Siebert was questioned about this during his deposition:

Q. So some females were held during the raid, right?

A. Everyone was held during the raid.

Q. Children?

A. Yes, everyone was detained.

Q. Older adults?

A. Everybody.

Q. Everybody. If there were pregnant women, older adults, children, they were detained, too?

A. If you were there, you would have been detained.

Q. And the reason?

A. *Standard operating procedure* . . . [T]he team executing [the warrant] really doesn't know of the whole investigation. All they know is their job is to safely secure a particular location.[27]

Q. In this case they handcuffed just about everybody?

A. Yes, I believe so.

---

**23.** *Id.* at 994 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483–85, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)).

**24.** *Pembaur*, 475 U.S. at 480, 106 S.Ct. 1292.

**25.** *Id.* at 481, 106 S.Ct. 1292.

**26.** *Id.*

**27.** Dep. Troy Siebert at 75–76 (June 30, 2004).

Q. For what purpose?

A. Basically standard operating procedures. When we secure any type of premises, everything is secure. When the processing team comes in it's up to the people processing on whether or not they uncuff or arrest or whatever needs to occur at that point.[28]

Officer Carroll Mayes, who was not named as a defendant in this case, was the "tactical commander" in charge of the operation and testified that "overall control rests with the tactical commander." [29] Officer Mayes made the decision to execute the warrant as a Category C warrant. It appears that Officer Mayes had final authority with respect to this decision and the defendants do not contend otherwise. Officer Mayes testified that under his direction the SWAT team conducted a "walk-through" in preparation for the actual raid. "The main purpose of a walk-through, which is done on any tactical operation, is to ensure that everyone's—all the officers understand what their assignment is and where they should go in their performance of their duty in the service of the search warrant." [30]

Officer Marty Vuyk, the commander of the operation at La Diana, testified that everything went according to plan:

Q. Okay. So after the action was taken, then they gave you the information again so that you could verify that everything was done according to the plan and the information that you had beforehand, right?

A. That's correct.

Q. Okay. Would it be fair to say that after the raid took place, that you felt that the operation had been well planned, right?

A. Yes.[31]

The defendants' Statement of Undisputed Facts states that "initially ordering everyone to the ground then handcuffing everyone until they could be sorted out" were "usual procedures" in the execution of a Category C warrant.[32]

■ In sum, the defendants do not dispute that the search warrant was executed according to standard operating procedure for a Category C warrant; or in other words, according to the policy of the City. Moreover, the final decision to execute the warrant as a Category C warrant was made by Carroll Mayes, who himself testified that he was the tactical commander who had "overall control" of the operation. As such, Officer Mayes appears to be a person with final policy-making authority on the matters at issue here. The court therefore holds, as a matter of law, that the decision on how to execute the warrant was made by persons with final policy-making authority. This is a question for the court, not the jury.[33] The court also holds that there is a genuine issue of material fact as to whether a City policy or procedure led to the alleged constitutional violations.

> Once those officials who have the power to make official policy on a particular issue have been identified, it is for the jury to determine whether *their* decisions have caused the deprivation of rights at issue by policies which affirmatively command that it occur ... or by acquiescence in a longstanding practice

**28.** *Id.* at 96–97.

**29.** Dep. Carroll Mayes at 5 (July 6, 2004).

**30.** *Id.* at 6–7.

**31.** Dep. Marty Vuyk at 30 (July 8, 2004).

**32.** Salt Lake City Defs. Mem. in Supp. of Mot. for Summ. J. at xiii, Statement of Undisputed Fact ¶ 36.

**33.** *See Jett v. Dallas Independent School Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989).

or custom which constitutes the 'standard operating procedure' of the local government.[34]

In sum, a reasonable jury could find that the City is liable for alleged constitutional violations occurring during the raid.

### Alleged Constitutional Violations

██ The potential liability of the City is, of course, irrelevant if there is no genuine issue of material fact as to whether or not constitutional violations occurred. The court finds that there are genuine issues of material fact with respect to whether the warrant was executed in a reasonable manner.

The court must, of course, take the facts in the light most favorable to the plaintiffs. As such, there are several triable issues regarding execution of the warrant. The jury must determine whether the amount of force the police used was reasonable under the circumstances, particularly inside the premises of La Diana where the police used significant power against the owners, employees, and customers of La Diana. Several reasons support this conclusion. First, there is abundant evidence in the record that the owners and employees of La Diana had contacted the police on several occasions to complain about the drug dealing occurring in the parking lot. Yet, somehow, this led the police to suspect those very owners and employees of being involved in the drug operation they were reporting to the police. Second, the police had no direct evidence that any owner or employee was involved in the sale of cocaine or heroin. The only direct evidence the police had about the sale of drugs inside the premises came from the Attorney General's office and involved Darvon, a low-level narcotic. Officer Steed testified that the SWAT team would never have become involved solely to execute a search warrant merely for Darvon.

Officer Doubt also suspected that employees of La Diana were involved because he believed J. Dee Carlson had whistled as Officer Doubt had arrived to investigate the drug dealing in the parking lot. Officer Doubt, however, had no explanation as to why Mr. Carlson would call to report the drug dealing and then alert the drug dealers when the police arrived. This incident alone could not have created probable cause that the owners and employees of La Diana were engaged in selling cocaine and heroin. Third, all of the controlled buys of cocaine and heroin took place in the parking lot outside of La Diana. No attempt was ever made by Salt Lake City police to confirm the otherwise vague information that owners or employees of La Diana were engaged in selling cocaine or heroin. Fourth, the only evidence of any weapons inside of La Diana was the alleged statement of J. Dee Carlson to Officer Doubt that Rafael Gomez carried a gun and kept one on the premises, and that if the police did not take care of the drug problem, Gomez would. Yet, Officer Doubt testified that he did not believe J. Dee Carlson was trustworthy. Moreover, if Mr. Carlson was acting as a lookout for the drug dealers in the parking lot, why would he inform the police that the owner had a gun and that if the police did not do something about the drug dealers in the parking lot, Rafael Gomez would? Finally, the police were aware that a large number of innocent persons would get caught up in the service of a Category C warrant and would have to be handcuffed, detained, identified, and photographed before they could be sent on their way. Such an operation certainly calls for great caution and extensive planning. Whether appropriate caution was exercised here will be for the jury to find.

34. *Id.*

In sum, taking the facts in the light most favorable to the plaintiffs, the police had little, if any, evidence that the owners or employees of La Diana were somehow connected to the sale of heroin and cocaine. Indeed, those very owners and employees had been trying to get the police to take care of the drug problem in the parking lot. The only evidence of narcotics sales occurring inside the premises of La Diana was a single controlled buy of Darvon, a low-level narcotic. Yet, based on this information, a SWAT team of 47 police officers armed with large automatic and semi-automatic weapons and clothed in full SWAT team gear, raided not only the parking lot of La Diana (where the entire investigation was focused and where all of the controlled buys of cocaine and heroin had occurred) but also La Diana itself, including the restaurant, store, and tortilla factory. The officers pointed guns at and handcuffed nearly everyone present, including at least one child, and detained them for a period of up to three hours. Four of the remaining plaintiffs were simply customers at La Diana, one of the plaintiffs was a self-employed contractor doing work outside La Diana, two were children aged eleven and six, and the other nine are either owners or employees of La Diana, including a cook, a cashier, and a bookkeeper, among others. These facts create a genuine issue of material fact with respect to the reasonableness with which the warrant was executed.

### Validity of the Warrant

■ Plaintiffs further contend that the search warrant in this case was issued based upon an affidavit containing false statements and reckless disregard for the truth. If true, this claim can only go forward against Officer Siebert, who was the affiant. "An action under § 1983 does lie against an officer who obtains an invalid search warrant by making, in his affidavit, material false statements either knowingly or in reckless disregard for the truth." [35]

In general, the fact-finding involved in this determination "is the province of the jury." [36] The court must decide, however, whether there is a genuine issue of material fact as to whether or not the affidavit contains false statements. If there is a genuine issue of material fact as to whether the affidavit contains material false statements, "the question whether the judicial officer issuing the warrant would have done so even without the knowingly or recklessly false statement is one for the jury." [37]

Plaintiffs contend that the affidavit in question was proffered in reckless disregard for the truth because it failed to clarify the source of some information and failed to clarify that the investigation focused primarily on activity occurring in the parking lot of La Diana and not actually inside the complex. For example, the affidavit continually refers to information that "person(s) *at* 56 South 900 West are engaged in an ongoing narcotics distribution operation." Indeed, the only time the affidavit is clear that activity occurred inside the building is its description of the location of the illegal Darvon tablets and a single controlled buy of Darvon. This is the only investigative activity clearly linking anybody inside La Diana to any illegal activity.

■ The court finds, however, that any allegedly false statements were not material to the issuance of the warrant. The plaintiffs do not dispute that an illegal sale of Darvon was made inside La Diana and that this sale gave rise to probable cause

---

**35.** *Hill v. McIntyre*, 884 F.2d 271, 275 (6th Cir.1989).

**36.** *Id.*

**37.** *Id.* at 275–76.

to search not only the La Diana store, but also the restaurant. As a result, the warrant was properly issued for the police to search everywhere inside the La Diana restaurant. No invasion of privacy can be attributed to the allegedly misleading information about cocaine and heroin sales. There was some dispute at oral argument concerning whether the warrant gave the police the right to search both the restaurant and the tortilla factory. Because the buildings are connected and are part of the same structure, the court finds that the warrant properly authorized a search of the whole premises. This is clear from the plain language of the warrant which authorized a search of the entire structure "and the surrounding grounds and any garages, storage rooms, and outbuildings of any kind located upon the curtilage of the property." Any claim that the warrant authorized a search of only the store portion of the complex where the Darvon was sold is contrary to the plain language of the warrant. Moreover, probable cause extended to both the restaurant and the factory. The affidavit recounted an illegal sale of Darvon. The source of that Darvon could have been found in either the store, or the restaurant. Finally, because the warrant authorized the invasion of the entire premises to search for Darvon, no additional intrusion can be attributed to the allegedly misleading information about cocaine and heroin. That information is not material to any dispute here. The real crux of plaintiffs' complaint is the manner in which the search warrant was executed, not the validity of the warrant.

Inasmuch as the court has determined that the affidavit in question does not contain false statements that were material to the issuance of the warrant, summary judgment is granted in favor of the defendants on this issue. The issues raised in challenging the affidavit and the warrant more properly go to the reasonableness of the execution of the warrant.

## Seizure Issues

The plaintiffs also allege that they were improperly detained during the drug raid. The City does not dispute that a seizure of all of the plaintiffs occurred; the only dispute is whether the seizure was reasonable under the circumstances.

Three separate issues are presented concerning the alleged unlawful seizure of the plaintiffs: First, whether the initial detention of the plaintiffs was a violation of the Fourth Amendment; second, whether the initial detention was unduly prolonged in violation of the Fourth Amendment; and third, whether the mode and manner of the detention was unreasonable in violation of the Fourth Amendment. " '[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable.' "[38]

In this case we have multiple seizures. The issue is whether the seizures were reasonable under the Fourth Amendment. This determination must be made by looking at each stage of the seizure. "A reviewing court must analyze each stage of the encounter, ensuring that the requisite level of suspicion or cause is present at each stage."[39]

### The Initial Seizure

The first issue presented is whether the initial seizure of everyone on the premises on the day of the raid was reasonable under the Fourth Amendment. The City notes that a limited line of cases has devel-

**38.** *United States v. Shareef,* 100 F.3d 1491, 1499 (10th Cir.1996) (quoting *New Jersey v. T.L.O.,* 469 U.S. 325, 327, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985)).

**39.** *Shareef,* 100 F.3d at 1500.

oped which hold that police may detain the occupants of a residence while that residence is being searched pursuant to a valid search warrant.

In the leading Supreme Court case of *Michigan v. Summers*,[40] the Detroit police detained an individual as he was leaving a house they were entering with a warrant to search for narcotics. The police discovered that the individual, Summers, lived in the home. They requested his help in gaining entry and then detained him for the duration of the search. In executing the warrant the police discovered narcotics in the basement and arrested Summers. They then searched his person and discovered heroin in his coat pocket. Summers challenged his detention and the search of his person as violations of the Fourth Amendment. The Court found that the detention of Summers was not a violation of the Fourth Amendment, holding that "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted."[41]

It appears that the holding of *Summers* is limited to occupants of the residence, generally meaning residents.[42] As *Summers* explains, the Fourth Amendment protects privacy and when a warrant is issued to search a residence a "substantial invasion of the privacy of the persons who reside[ ] there" has already been authorized so that the detention of the occupants of the residence is "surely less intrusive than the search itself."[43] This is not true of persons who merely happen to be at a location where a search warrant is executed—especially at a public place such as La Diana where many persons with no connection to any alleged illegal activities could be expected to be found. Moreover, *Summers* also noted that "most citizens— unless they intend flight to avoid arrest— would elect to remain [at their residence] in order to observe the search of their possessions."[44] By contrast, persons with no connection to the premises, such as patrons at La Diana, are unlikely to have any possessions there. *Summers* also observed that because Summers was detained in his own home, "it could add only minimally to the public stigma associated with the search itself and would involve neither the inconvenience nor the indignity associated with a compelled visit to the police station."[45] In this case, we have the contrary situation where persons were detained not in their own home, but in public in an arguably humiliating fashion. *Summers* further explained that the police have an interest in detaining occupants of a residence to prevent flight "in the event that incriminating evidence is found."[46] Again, this is only true of persons who are connected to the premises being searched. Finally, occupants of a home can assist in the "orderly completion of the search" by opening locked doors or containers.[47] This

---

**40.** 452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981).

**41.** *Id.* at 705, 101 S.Ct. 2587.

**42.** *See id.* at 705 n. 21, 101 S.Ct. 2587 ("[W]e are persuaded that this routine detention of *residents* of a house while it was being searched for contraband pursuant to a valid warrant [was justified]."); *see also United States v. Ritchie*, 35 F.3d 1477 (10th Cir.1994) (detention of resident in his home during search under circumstances significantly less intrusive than an arrest was justified); *United States v. Bennett*, 329 F.3d 769 (10th Cir. 2003) (same).

**43.** *Summers*, 452 U.S. at 701, 101 S.Ct. 2587.

**44.** *Id.*

**45.** *Id.* at 702, 101 S.Ct. 2587.

**46.** *Id.*

**47.** *Id.*

is not true of bystanders caught up in the middle of a drug raid.

In addition to all of these reasons, the Court also suggested that the probable cause used to obtain the warrant provides "individualized suspicion on which the police base the detention of the occupant of a home subject to a search warrant." [48] The existence of a warrant shows that

> [a] judicial officer has determined that police have probable cause to believe that someone in the home is committing a crime. Thus a neutral magistrate rather than an officer in the field has made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of a home. *The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant.*[49]

Nothing in the Court's reasoning in *Summers* suggests that the police would have been justified in detaining a person who merely happened to be on the premises at the time a warrant was executed. *Summers*, however, involved detention of an individual for the full duration of the search. Implicit in the holding of the Court was that the *initial* detention of Summers, even before the police knew who he was, was appropriate. In a situation presenting facts similar to this case the Third Circuit held, "Although *Summers* itself only pertains to a *resident* of the house under warrant, it follows that the police may stop people coming to or going from the house if police need to ascertain whether they live there." [50] In executing a warrant, police do not know who they will find on the premises. It seems clear, therefore, that the police would be justified in the initial detention of everyone present in order to stabilize the situation and determine who the "occupants" of the location were and whether other persons present have some direct connection to the search warrant. This initial detention of everyone present, however, is limited to this "sorting" function. Only "occupants" (or their functional equivalents) may be detained for the duration of the search, and then only under circumstances "significantly less intrusive than an arrest." [51]

In this case, it was reasonable for the police to initially detain every person present. This is true for several reasons. First, it is appropriate when executing a warrant for the police to secure the situation before sorting out the details. "The risk of harm to both the police and the occupants [and bystanders] is minimized if the officers routinely exercise unquestioned command of the situation." [52] The police did not know who they would find at La Diana that day. There was some evidence, although minimal, that the owner of the store carried a firearm, and there was evidence that some of those dealing drugs outside the store also carried firearms. There was also the concern that evidence might be destroyed. As such, the police were justified in taking immediate control of the situation. Second, most of the officers who participated in the raid were not a part of the investigation and did not know which individuals were owners or employees and which were suspected of dealing drugs. Therefore, the police were

48. *Id.* at 703, 101 S.Ct. 2587.

49. *Id.* at 703–04, 101 S.Ct. 2587 (emphasis added).

50. *Baker v. Monroe Township*, 50 F.3d 1186,-1192 (3d Cir.1995).

51. *Summers*, 452 U.S. at 697, 101 S.Ct. 2587.

52. *Id.* at 702–03, 101 S.Ct. 2587.

justified in detaining everyone until identities could be sorted out.

It was also reasonable for the police to detain Rafael, Elvia, and Sergio Gomez for the duration of the search. As the owners of La Diana, the Gomez's are akin to the "occupants" of the premises. The warrant authorized an invasion of their privacy insofar as it authorized a search of their business. It is not unreasonable to assume that they would have remained on the scene to observe the search and protect their property even without being detained. They were also in a position to assist the officers in an orderly completion of the search. This does not mean that Rafael, Elvia, and Sergio have no Fourth Amendment claim for an unreasonable seizure. As discussed below, there are still issues to resolve concerning *how* the warrant was executed.

■ In sum, the court finds that the initial seizure of everyone on the premises was justified. This holding, however, says nothing about the reasonableness of the manner in which the plaintiffs were seized. Even where a detention is justified under *Summers*, "police officers must still act reasonably because such a detention is a seizure under the Fourth Amendment."[53] *Summers* only applies where the seizure is "significantly less intrusive than an arrest."[54] In *United States v. Ritchie*,[55] the Tenth Circuit suggested that there might be cases where "the intrusiveness of [the] detention was sufficiently severe to preclude application of *Summers*."[56] In that case, the court rejected a claim that *Summers* should not apply because Mr. Ritchie did "not argue that the agents unduly prolonged his detention, and the record shows

that the agents never drew their guns and did not handcuff Mr. Ritchie until after they discovered [incriminating evidence]."[57] In contrast, this case involves claims both that the police drew their guns and handcuffed everyone present. In *Renalde v. City and County of Denver*,[58] the United States District Court for the District of Colorado held that *Summers* did not justify the manner in which the occupants were detained. In that case, the police detained the occupants of a home they were searching with a warrant by handcuffing them and placing them face floor on the ground. The police argued that the seizure was reasonable under *Summers*. The court disagreed. "*Summers* is limited to its facts and does not compel the result sought here by defendants as a matter of law. The intrusion in this case is qualitatively different. Plaintiffs were not merely 'detained.' They were handcuffed behind their backs and made to lie face down on the floor for a prolonged period of time. Moreover, after the initial sweep of the residence, which found no weapons, the justification for this kind of intrusive seizure dissipated."[59]

Taking the facts the plaintiffs have alleged, there are triable issues of fact regarding the manner of the plaintiffs' detention. While *Summers* justifies the initial *detention* of everyone present, the jury will determine whether the manner of the seizure was reasonable under the circumstances.

### The Prolonged Seizure

The next question to address is whether a lawful initial seizure was unconstitutionally prolonged. This question is directly

---

**53.** *Bennett,* 329 F.3d at 773.

**54.** *Summers,* 452 U.S. at 697, 101 S.Ct. 2587.

**55.** 35 F.3d 1477 (10th Cir.1994).

**56.** *Id.* at 1484.

**57.** *Id.*

**58.** 807 F.Supp. 668 (D.Colo.1992).

**59.** *Id.* at 672.

related to the court's holding that *Summers* applies only to the initial detention of the plaintiffs and then only for the purpose of securing the site and determining whether each person was an "occupant" of the premises.

While the detentions in this case may not have been based upon reasonable suspicion, the most applicable line of cases are those involving the issue of whether an investigative stop based upon reasonable suspicion was unreasonably prolonged. "Under this approach [the court] examine[s] 'whether the officer's action was justified at its inception, and whether [the detention] was reasonably related in scope to the circumstances which justified the interference in the first place.' "[60]

The Tenth Circuit has held that "[t]he *government* has the burden of demonstrating that the seizure it seeks to justify on the basis of a reasonable suspicion was *sufficiently limited in scope and duration* to satisfy the conditions of an investigative seizure."[61] Based on the evidence currently before the court, it cannot be said that the government has sufficiently met this burden to avoid a trial.

The Third Circuit addressed a similar situation in *Baker v. Monroe Township.*[62] In that case, just as police began executing a drug raid on an apartment pursuant to a "no-knock" warrant, family members of the resident of the apartment approached the front door for a visit. As the family members approached the door they were ordered to get down and were forced to the ground and handcuffed. They were left handcuffed for as much as twenty-five minutes. The court found that the initial

detention was appropriate under *Summers* for the purpose of determining the identity of the individuals. The court then turned to the issue of whether the detention was unreasonably prolonged, stating that "the court must examine the reasonableness of the detention, particularly whether the police were diligent in accomplishing the purpose of the stop as rapidly as possible."[63] Ten minutes of the detention had been spent in securing the premises and the other fifteen minutes in identifying the detained individuals. The Third Circuit found that the detention was not unreasonably prolonged. There was no evidence that the police were not being diligent. "We cannot say that a detention of fifteen minutes time to identify and release a fairly large group of people during a drug raid is unreasonable."[64]

The police in this case insist that they were as diligent as possible. They note that they brought along Spanish-speaking officers and INS agents to assist with translation and the processing of the individuals. Plaintiff Graciela Zamora, however, testified that because there were no Spanish-speaking officers inside La Diana she was asked to translate and help identify the detained persons.

Perhaps most important, the testimony of the plaintiffs in this case was that most were handcuffed and left on the floor for substantial periods of time before anyone even attempted to ascertain their identity. It should not have been that difficult to determine, for example, that plaintiff Martin Gutierrez was simply a customer having dinner in the restaurant on the day in question. Yet, Mr. Gutierrez testified that

**60.** *United States v. Sharpe*, 470 U.S. 675, 682, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (quoting *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).

**61.** *United States v. Perdue*, 8 F.3d 1455, 1462 (10th Cir.1993) (emphasis added).

**62.** 50 F.3d 1186 (3rd Cir.1995).

**63.** *Id.* at 1192.

**64.** *Id.*

he was handcuffed face-down on the floor for 45 minutes before anyone asked him to produce identity. Plaintiff Carlos Trevizo was in a dump truck doing paving work when he was pulled from the truck and handcuffed. It arguably should have been obvious early on that he had no connection to the investigation. Mr. Trevizo testified that he was handcuffed for two hours before being released, during which time he was injured and asking for an ambulance.

The testimony of the plaintiffs creates genuine issues of material fact as to whether the length of their detentions was reasonable. The police were aware that potentially dozens of innocent persons would be at La Diana at 3:00 p.m. on a Friday afternoon. There were approximately 80 people at La Diana during the raid. There were 47 SWAT team officers as well as agents from the DEA, the INS, the FBI, and Davis County. Yet the plaintiffs testify that they were detained anywhere from one to three hours. Individual officers also testified that they were aware of the potential for pregnant women and children to be there. There appears to have been no provisional planning for this. As Officer Siebert testified, everyone was treated the same—even where their circumstances might have called for treating them differently. The court recognizes the difficulties that police officers face when confronted with a large number of persons found at the place of the execution of a search warrant. No doubt, all of the persons can be expected to profess "innocence" and lack of awareness of the situation. The police are entitled to sort through such claims in an orderly fashion and determine whether they are true. And it will be (hopefully) a rare case where a plaintiff can establish a triable issue regarding whether the police took too long

to make such a determination. This is one of those rare cases.

In sum, there is a genuine issue of material fact as to whether the length of the detention of the plaintiffs in this case was reasonable under all of the circumstances. The jury may very well determine that the police acted diligently and that there was little more that could have been done to speed up the process. Given the posture of the case today, however, the court cannot conclude that there is no genuine issue of material fact with respect to the length of the detention.

### The Means Used to Effectuate the Seizure

The last issue with respect to the seizure is whether the force used was reasonable under the circumstances of this case. "[T]he Fourth Amendment requires an examination of 'the reasonableness of the *manner* in which a search or seizure is conducted[.]'" [65] The Third Circuit's decision in *Baker*, discussed above, found that while the length of the detention was reasonable, a genuine issue of material fact remained concerning the manner of the detention:

> There is no per se rule that pointing guns at people, or handcuffing them, constitutes an arrest ... But use of guns and handcuffs must be justified by the circumstances ... Moreover, we must look at the intrusiveness of all aspects of the incident in the aggregate. In this case, adding up the use of guns and handcuffs and, indeed, the length of the detention, shows a very substantial invasion of the Bakers' personal security.[66]

The testimony in *Baker* revealed that "the police used all of those intrusive methods

---

**65.** *Holland,* 268 F.3d at 1188 (quoting *Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)).

**66.** *Baker,* 50 F.3d at 1193.

without any reason to feel threatened by the Bakers, or to fear the Bakers would escape." [67] The court also noted that it was daylight and that the appearance was simply one of a family making a social visit to a son. "[T]here is simply no evidence of anything that should have caused the officers to use the kind of force they are alleged to have used." [68]

"[A] court must scrutinize whether 'the totality of the circumstances justified a particular sort of search or seizure.'" [69] In the Tenth Circuit, the "totality of the circumstances" includes all conduct " 'immediately connected with the seizure.'" [70] This would, of course, include the use of guns and handcuffs, the threatening manner of the seizure, the length of the seizure, and even the language used in effecting the seizure. [71] The Tenth Circuit has stated that while it is "unlikely that harsh language alone would render a search or seizure 'unreasonable,' verbal abuse may be sufficient to tip the scales in a close case." [72] The Tenth Circuit has also specifically addressed whether the decision to use a SWAT team is conduct "immediately connected with the seizure":

> The decision to use a SWAT team to execute a warrant to make a "dynamic entry" into a residence constitutes conduct "immediately connected with the seizure" because it determines the degree of force initially to be applied in effecting the seizure itself. If, as *Garner* instructs, "it is plain that reasonableness depends on not only when a seizure is made, but also how it is car-

ried out," . . . then the decision to deploy a SWAT team to execute a warrant must be "reasonable" because it largely determines how the seizure is carried out, thereby determining the extent of the intrusion on the individual's Fourth Amendment interests. . . .

Where a plaintiff claims that the use of a SWAT team to effect a seizure itself amounted to excessive force, we review the decision to use that degree of force by "balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." [73]

▆▆▆ The court finds that there are genuine issues of material fact as to whether the amount of force used in this case was reasonable under the circumstances. "There are no hard-and-fast rules regarding the reasonableness of force used during investigatory stops, and prior cases have eschewed establishing any bright-line standards for permissible conduct." [74] In a case with facts similar to this one, the Tenth Circuit stated:

> The display of weapons, and the pointing of firearms directly at persons inescapably involves the immediate threat of deadly force. Such a show of force should be predicated on at least a perceived risk of injury or danger to the officers or others, based upon what the officers know at the that time . . . Where a person has submitted to the officers' show of force without resis-

67. *Id.*

68. *Id.*

69. *Holland, ex rel. Overdorff v. Harrington,* 268 F.3d 1179, 1188 (10th Cir.2001) (quoting *Garner,* 471 U.S. at 9, 105 S.Ct. 1694).

70. *Holland,* 268 F.3d at 1189 (quoting *Medina v. Cram,* 252 F.3d 1124, 1132 (10th Cir. 2001)).

71. *See Holland,* 268 F.3d. at 1194.

72. *Id.*

73. *Holland,* 268 F.3d at 1190 (citations omitted).

74. *United States v. Merkley,* 988 F.2d 1062, 1064 (10th Cir.1993).

tance, and where an officer has no reasonable cause to believe that person poses a danger to the officer or to others, it may be excessive and unreasonable to continue to aim a loaded firearm directly at that person, in contrast to simply holding the weapon in a fashion ready for immediate use.[75]

The determination of the reasonableness of the force used will, of course, differ with respect to each of the plaintiffs. But looking at the circumstances of this case as a whole, the court concludes that the plaintiffs' claims should be submitted to the jury. First, there is a genuine issue of material fact as to whether the initial decision to use a SWAT team was itself reasonable, particularly the decision to deploy the SWAT team inside La Diana. As discussed earlier, the only evidence police had of illegal activity inside of La Diana was the single controlled buy of Darvon over the counter. Officer Steed testified in his deposition that the SWAT team would not have been used to raid the store solely on the suspicion of Darvon sales.[76] Yet, 47 members of the SWAT team were used to conduct the raid inside the premises at La Diana.

The police also had second-hand knowledge that Rafael Gomez kept a firearm on his person and one in the store. The police never investigated to confirm this information, which came from a source, J. Dee Carlson, the police had otherwise found untrustworthy. The court cannot say, based on this evidence alone, that the decision to use the SWAT team was justified.

The use of guns and handcuffs also presents an issue for the jury. With the possible exception of Rafael Gomez, the police had no reason to believe that anyone inside the premises would be carrying a weapon.

Still, nearly everyone inside the premises, including children, had guns pointed at them and were handcuffed. It was mid afternoon, and there is no testimony that people were uncooperative with the police. Several of the plaintiffs were simply customers in the store, two were having lunch in the restaurant, two are children, and several are women (while all of the suspects identified in the warrant were males). There is no evidence that any of the plaintiffs presented any real danger to the police. There is no evidence that they resisted verbal orders from the police or that they attempted to flee. It was daylight, and the police were fully aware that they would find numerous innocent bystanders during the raid. All of these factors suggest that there is a genuine issue of material fact concerning the reasonableness of the force used. The court recognizes that the execution of search warrants involving illegal drugs is dangerous business. Police officers occasionally encounter armed resistance during such raids, and must obviously plan for the worst. But recognition of these facts does not give officers *carte blanche* to deploy force in all situations. Again, the question is one of reasonableness under all of the circumstances. There are plausible arguments of both sides here, so the matter will go to the jury.

There is also concern about the length of time the plaintiffs were forced to wear handcuffs. Even if the handcuffs were initially justified, there is a question as to the reasonableness of leaving all of the plaintiffs in handcuffs for a prolonged period of time. As the court found in *Renalde*, "after the initial sweep of the residence, which found no weapons, the justification for this kind of intrusive seizure dissipated."[77]

---

75. *Holland,* 268 F.3d at 1192–93.

76. *See* Dep. Chad Steed at 24 (July 7, 2004).

77. *Renalde,* 807 F.Supp. at 672.

The City points to the fact that the judge who issued the warrant told them to handcuff everybody present. The judge, however, was not present at the raid and did not direct a length of time for handcuffs to be used. More important, as discussed above, the affidavit in this case failed to clarify that the investigation had focused almost entirely on activities occurring in the parking lot. The police were aware of this, while the judge was not. The police were also aware that there was no evidence of cocaine or heroin inside the premises. The judge's statement to the police presents a factual issue for the jury to review in determining the reasonableness of the execution of the warrant. It does not, however, automatically insulate the police from all liability connected with the manner in which handcuffs were used. Of course, a few of the plaintiffs were detained and handcuffed in the parking lot rather than inside La Diana. This is also an issue the jury may consider in determining the reasonableness of the seizure with respect to each of the individual plaintiffs.

The testimony in this case further reveals that the use of guns and handcuffs and the amount of force shown was generally according to "standard operating procedure." The decision to use the SWAT team, however, does not protect the police from the requirement of reasonableness.[78] Rather, the decision to use the SWAT team must itself be reasonable under the circumstances. And if the decision to use the SWAT team is justified, the police must still be cautious, especially in a situation such as this where it is clear before-

hand that potentially dozens of innocent bystanders will be present. "If anything, the special circumstances and greater risks that warrant 'dynamic entry' by a SWAT team call for *more* discipline, control, mindfulness, and restraint on the part of law enforcement, not less." [79]

Finally, the issue of the degree of force used deserves a special word with respect to the two children who are plaintiffs in this case. Leonardo Gomez was eleven on the day of the raid; Jorge Gomez was six. Apparently Leonardo was handcuffed but Jorge was not. Leonardo also testified that he saw one of the officers point a gun at the head of Jorge, and Jorge testified that he had a gun pointed at him. In *Holland v. Harrington*,[80] the Tenth Circuit upheld a district court decision that pointing weapons at children presents a triable issue of reasonableness for the jury.[81] The court noted, "Pointing a firearm directly at a child calls for even greater sensitivity to what may be justified or what may be excessive under all the circumstances." [82] If the allegation of pointing weapons at the children in this case is true, this court agrees with the Seventh Circuit which stated under similar circumstances that:

> It should have been obvious to [the officers] that [the] threat of deadly force—holding a gun to the head of a 9–year old and threatening to pull the trigger—was objectively unreasonable given the alleged absence of any danger to [the officers] at the scene and the fact that the victim, a child, was neither a suspect nor attempting to evade the officers or posing any other threat.[83]

---

78. *See id.* at 671 (rejecting argument that policy of detaining and handcuffing all occupants of a residence searched pursuant to a warrant is objectively reasonable).

79. *Holland,* 268 F.3d at 1194.

80. 268 F.3d at 1188.

81. *See id.* at 1192.

82. *Id.* at 1193.

83. *Id.* (quoting *McDonald by McDonald v. Haskins,* 966 F.2d 292, 295 (7th Cir.1992)).

In conclusion, the court is fully aware of the need for police officers to protect themselves and others whenever conducting a potentially dangerous operation. In addition, "A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." [84] While the actual raid presented a swift-moving scenario, most of the difficulties here arguably could have been prevented with a more carefully drafted affidavit, more thorough investigation, and a more carefully planned raid. Under these circumstances, the jury could reasonably find that the Fourth Amendment rights of the plaintiffs were violated.

### Search Issues

While *Summers* authorizes temporarily detaining occupants under special circumstances, it does not authorize a search of persons detained. Indeed, case law specifically prohibits *any* search of such persons without probable cause. This was made clear by the Supreme Court's decision in *Ybarra v. Illinois.* [85] In *Ybarra*, the police entered a tavern pursuant to a search warrant. Several officers went to the tavern to execute the warrant. The officers entered and announced their purpose and then announced that they were going to frisk everyone present to search for weapons. One of the patrons, Ybarra, was found to have heroin in his pocket. Ybarra challenged the search as unconstitutional. The Court agreed.

It is true that the police possessed a warrant based on probable cause to search the tavern in which Ybarra happened to be at the time the warrant was executed. But, a person's mere propin-quity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person ... Where the standard is probable cause, a search or seizure of a person must be supported by probable cause particularized with respect to that person. This requirement cannot be undercut or avoided by simply pointing to the fact that coincidentally there exists probable cause to search or seize another or to search the premises where the person may happen to be. The Fourth and Fourteenth Amendments protect the "legitimate expectations of privacy" of persons, not places. [86]

The holding in *Ybarra* extended even to the frisk for weapons. "The initial frisk of Ybarra was simply not supported by a reasonable belief that he was armed and presently dangerous, a belief which this Court has invariably held must form the predicate to a patdown of a person for weapons." [87] Nor was the frisk warranted under *Terry.* "The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place." [88]

In *Summers*, the Court was careful to maintain the distinction between the police's right to detain the occupant of the residence being searched pursuant to a warrant, and any purported right to search the occupant:

The "seizure" issue in this case should not be confused with the "search" issue presented in [*Ybarra*]. In *Ybarra* the police executing a search warrant for a

---

**84.** *Sharpe,* 470 U.S. at 685–86, 105 S.Ct. at 1575.

**85.** 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979).

**86.** *Id.* at 91, 100 S.Ct. 338.

**87.** *Id.* at 92, 100 S.Ct. 338.

**88.** *Id.* at 94, 100 S.Ct. 338.

public tavern detained and searched all of the customers who happened to be present. No question concerning the legitimacy of the detention was raised. Rather, the Court concluded that the search of Ybarra was invalid because the police had no reason to believe he had any special connection with the premises, and the police had no other basis for suspecting that he was armed or in possession of contraband.... [89]

So, a brief detention, such as was at issue in *Summers* can be justified by circumstances unrelated to any apparent danger posed by the person detained, but a search of that person requires additional justification. This exact issue was also presented in the Third Circuit case of *Baker*. In that case, the police looked through a wallet taken out of the back pocket of one of the plaintiffs and another plaintiff's pocketbook was emptied out on the ground. The court found that while the plaintiffs were properly detained under *Summers*, there was no justification for the searches.[90]

 Any search of the plaintiffs in this case was presumptively unreasonable. The defendants have made no attempt to establish that probable cause or reasonable suspicion existed. The City does contend that any of the searches that occurred were consented to.

Plaintiff Elvia Gomez is the only defendant who testified that her person was searched during the raid. Defendants contend this claim should be dismissed because Ms. Gomez cannot identify if it was a Salt Lake City police officer who searched her. Because these claims are going forward against the City and not the individual defendants, Ms. Gomez must only demonstrate that it was a Salt Lake City officer who searched her. Furthermore, the standard is a preponderance of the evidence. Ms. Gomez did testify that she was searched by a woman wearing a blue uniform. As the court understands the facts at this point, a majority of blue uniformed officers were City officers. On this understanding, the issue will go to the jury. If the woman who searched Ms. Gomez was not a Salt Lake City police officer, the City can prove this at trial.

Plaintiff Sergio Gomez testified that the police took his wallet from his pocket and went through it.[91] There is no indication that he consented. This presents a triable issue for the jury.

Plaintiff Leticia Hernandez testified that the police searched her bag for documentation. Her testimony reflects, however, that she consented to the search.[92] There is no genuine issue of material fact with respect to her claim, and summary judgment is therefore appropriate in favor of the City.

Plaintiff Martin Gutierrez testified that the police took his wallet out of his pocket and searched it.[93] There is no indication that he consented to the search. This presents a triable issue for the jury.

Plaintiff Graciela Zamora testified that her purse was searched. There is a dispute about whether or not she consented which presents a triable issue for the jury. She was asked whether she gave permission for the police to search her purse. "Well, permission, permission I'm not sure.

**89.** *Summers*, 452 U.S. at 695–96, 101 S.Ct. 2587.

**90.** *See Baker*, 50 F.3d at 1194.

**91.** *See* Dep. Sergio Gomez at 30 (July 14, 2004).

**92.** *See* Dep. Leticia Hernandez at 14–15 (July 27, 2004).

**93.** *See* Dep. Martin Gutierrez at 11 (July 15, 2004).

They asked for my identification, my hands were handcuffed and I said, there's my bag." [94] While Ms. Zamora was handcuffed, her answer reflects that she did consent to have the police look into her purse for her identification. Summary judgment for the City is this claim is proper as well.

Plaintiff Maricela Gomez also testified that her purse was searched. "They just told me they were gonna look in my purse. So they grabbed it and they looked in." [95] This presents a triable issue for the jury.

Plaintiff Fidel Salazar testified that the police searched his bag for his residency papers. [96] There is no indication that he consented. This presents a triable issue for the jury.

Plaintiff Cory Burt's car was searched. He testified that he was asked by an officer if she could search his car. He responded, ". . . if I say no, you are going to pull me over down the street and run through my car anyway. She said, 'that's right.' . . . So I said, 'Go ahead then.' I had no choice." [97] This presents an issue of whether or not Mr. Burt in fact actually consented, which should go to the jury.

Plaintiff Carlos Trevizo testified that his dump truck and personal truck were searched. "They said they wanted to search it so I asked him, 'What did you search it for?' [They said,] 'We do it because we want to.' Oh, okay, go ahead and do it." The testimony of Mr. Trevizo is ambiguous enough that it should go to the jury. Once the evidence presents itself more clearly, a renewed motion might be appropriate with respect to this claim.

Plaintiff Cynthia Rodriguez testified that she was asked to present identification. Her identification was in her purse. "So I was ready to grab it, and he snatched it off—out of my hand . . ." While Ms. Rodriguez was apparently willing to show her identity, she did not consent to a search of her purse. This presents a triable issue for the jury.

Plaintiff Florentino Rodriguez testified that the police took his wallet without his permission. [98] He does not state that the police looked in his wallet, but it is at least implied. This presents a triable issue for the jury.

None of the other plaintiffs have presented any evidence that they were subject to any searches. As such, summary judgment is granted in favor of the City as to these plaintiffs.

Because these claims are going forward against the City, the plaintiffs will have to establish that the actions of the officers were according to a custom or policy of the City to prevail on these claims. The general testimony that the raid took place according to "standard operating procedures"—without any direct counter-testimony—is enough at the summary judgment stage to establish a genuine issue of material fact on this issue.

### Photographing and Questioning Concerning Identity

 The next issue presented for resolution is whether the police violated the rights of the plaintiffs in questioning them concerning their identity and in photographing them before releasing them.

---

**94.** Dep. Graciela Zamora at 16–17 (July 27, 2004).

**95.** Dep. Maricela Gomez at 28 (July 16, 2004).

**96.** *See* Dep. Fidel Salazar at 9–10 (July 15, 2004).

**97.** Dep. Carlos Trevizo at 41 (July 14, 2004).

**98.** *See* Dep. Florentino Rodriguez at 21 (July 16, 2004).

Questions concerning identity can implicate the Fourth Amendment. Defendants cite the recent Supreme Court decision in *Hiibel v. Sixth Judicial District Court of Nevada, Humboldt County*[99] for the proposition that police officers are free to ask for identification without implicating the Fourth Amendment. *Hiibel*, however, does not stand for so sweeping a proposition. *Hiibel* establishes only that the police are free to request identification during the course of a *Terry* stop based upon reasonable suspicion. Under *Summers*, however, the court concludes that it was reasonable for the police to request identification from those present.

The plaintiffs argue that the police went beyond simply asking for identification to interrogating the plaintiffs about their immigration status. Plaintiffs have not identified which officers allegedly asked these questions, and several of the plaintiffs testified that they were not asked about their immigration status. Others testified that they were asked to present residency papers. Because summary judgment has been granted in favor of the individual officers, and because the City has established that it had no policy or custom of asking about the immigration status of detained suspects, the court finds that there is no genuine issue of material fact with respect to the questioning concerning identity and immigration status.

Plaintiffs also allege that the photographs taken by the police violated their Fourth Amendment rights. The photographs do not constitute a separate violation but do present evidence for the jury in determining the reasonableness of the seizure of the plaintiffs.

## Excessive Force

■ Claims of excessive force are also governed by the Fourth Amendment's "objective reasonableness" standard.[100] The court has already discussed whether the manner in which the warrant was executed was reasonable. In addition, plaintiffs allege excessive force in the sense that certain of the plaintiffs were shoved, kicked, or otherwise treated in an excessive manner beyond the guns and handcuffs used in executing the warrant. The complaint is again not specific enough, stating simply that "[t]hose Plaintiffs who did not respond quickly enough to Defendants' orders were kicked, pushed or beaten."[101] The complaint does not identify which plaintiffs claim excessive force was used against them or which officers were guilty of excessive force. An independent review of the depositions suggests that some of the plaintiffs were pushed or kneed in the back, while others testified that they were not subject to any excessive force. The court notes specifically the treatment of Carlos Trevizo, who testified at his deposition that he was pulled from his dump truck, shoved, and kicked and apparently required surgery as a result of his injuries. The court notes also the deposition of Rafael Gomez who allegedly was struck with a gun and injured by the police. Others who saw Mr. Gomez also testified that he was injured as a result of police actions.

The problem here again is that the plaintiffs fail to identify which officers allegedly were engaged in using excessive force. Carlos Trevizo testified at his deposition that he knew one of the officers who pulled him from the truck. The officer, however, is nowhere identified in either

---

**99.** —— U.S. ——, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004).

**100.** *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

**101.** Second Am. Compl. 63(12).

the complaint or the pleadings accompanying this motion. Rafael Gomez also does not identify which officers allegedly used excessive force against him. Nor does it appear that the defendants were deposed concerning these matters. Plaintiffs may have been able to discover which officers pulled Mr. Trevizo from his truck, but such an attempt does not appear to have been made. Plaintiffs might at least have attempted to identify which officers were responsible for containing the area where Mr. Trevizo was located. Had they done so, it might have been appropriate to then let this claim go forward against all of those officers, shifting the burden to the officers to establish which officers were responsible for Mr. Trevizo's injuries. Plaintiffs, however, have apparently not attempted to identify the officers responsible.

Nor can the claims of excessive force go forward against the City. Plaintiffs have not demonstrated that these actions were in accord with City policy or custom, and defendants specifically deny any such policy.

Summary judgment is therefore appropriate in favor of all defendants on the claims of excessive force.

## Violation of Privacy

Plaintiffs also claim that their right to privacy protected by various amendments to the Constitution was violated. This claim is simply a restatement of their Fourth Amendment claims. The Supreme Court has held that claims against police officers for unreasonable searches and seizures and excessive force should be analyzed under the Fourth Amendment rather than the more general substantive due process standard.[102] To the extent that the complaint raises claims about privacy rights not based on the Fourth Amendment, summary judgment is granted as to all defendants.

## Violation of Miranda Rights

There is no civil cause of action for failure to give *Miranda* warnings. This was recognized by the Tenth Circuit in *Bennett v. Passic.*[103] The Fifth Amendment does not create a constitutional right to *Miranda* warnings; it guarantees only a right against self-incrimination. There was some question about this following the Supreme Court's decision in *Dickerson v. United States.*[104] More recently, however, the Supreme Court explicitly held in *Chavez v. Martinez*[105] that the failure to give *Miranda* warnings does not give rise to a section 1983 claim. Summary judgment is therefore granted on all *Miranda* claims.

## Violation of Right to Association

■■■ Plaintiffs claim that the police raid infringed their First Amendment right to assembly and association also fails. Neither right is implicated in this case. "The First Amendment protects the right to associate for the purpose of engaging in speech, assembly, petition for the redress of grievances, and the exercise of religion. '[W]hen the state interferes with individuals' selection of those with whom they wish to join in a common endeavor, freedom of association ... may be implicated.' "[106] Plaintiffs were not engaging in any First Amendment activity at the time the raid occurred. Therefore, they have no claim for violation of the freedoms to assemble

---

**102.** *See Graham,* 490 U.S. at 388, 109 S.Ct. 1865 ("such claims are properly analyzed under the Fourth Amendment's 'objective reasonableness' standard, rather than under a substantive due process standard").

**103.** *See* 545 F.2d 1260, 1263 (10th Cir.1976).

**104.** *See* 530 U.S. 428, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).

**105.** *See* 538 U.S. 760, 772–73, 123 S.Ct. 1994, 155 L.Ed.2d 984 (2003).

**106.** *Valdez v. New Mexico,* 2004 WL 1949130 *5 (10th Cir.2004).

and associate. Moreover, the gravamen of the plaintiffs' complaint is a Fourth Amendment claim. It should not be re-framed as a First Amendment claim. Summary judgment is granted on these claims as well.

### Religious Discrimination

■ The parties have spent considerable time arguing the issue of religious discrimination. Plaintiffs claim religious discrimination on the grounds that Defendants knew, or at least should have known, that most of employees and customers at Panaderia were Hispanic and therefore most likely Catholic. Based on this assumption, they claim that the investigation and raid was a "product of bigotry toward Hispanics and their religion [Catholicism]." Plaintiffs have failed to produce any evidence to support the claim that plaintiffs were targeted because of their religion. There is no evidence that the officers targeted the Panaderia because of its association with the Catholic religion or that Defendants were even aware that the owners, employees, or patrons were in fact Catholic. Plaintiffs' only factual basis for this claim is that police broke a picture of Our Lady of Guadalupe during the execution of the search warrant. Only one of the plaintiffs witnessed the picture break and her testimony as to whether or not it was intentional is equivocal at best. Even if the destruction of the picture was intentional, it was the single act of a single unidentified officer and certainly not something that can be imputed to the City or to the other officers. Nor does there appear to have been an attempt to identify the officer responsible. In sum, there is no basis for a claim of religious discrimination. Summary judgment is therefore granted in favor of all defendants on the claim of religious discrimination.

### Racial Discrimination

Several of plaintiffs' claims have racial discrimination as a required element including their first claim for relief under section 1983 for violation of the Equal Protection Clause, their second claim for relief under section 1985, their third claim for relief under section 1981, and their fourth claim for relief under section 1982.

■ Plaintiffs have presented no evidence that the raid was racially motivated. In their memorandum opposing summary judgment, the plaintiffs argue that the police "made the assumption that because the Hispanic street dealers were Hispanic, Panaderia's Hispanic owner must have been the supplier with large quantities of cocaine and heroin."[107] No evidence has been presented to sustain this sweeping allegation. Plaintiffs also argue that the white-owned businesses adjacent to Pioneer Park, an area several blocks away from La Diana, were treated more favorably than Hispanic-owned businesses. Even if this general statement were true, it provides no evidence that this particular police action was racially motivated. Finally, plaintiffs also argue that racist language used during the raid proves discriminatory intent. Plaintiffs fail to identify which officers allegedly used the racist language; therefore, it is impossible to know whether these officers were engaged in the investigation of La Diana or the planning of the raid or were merely assigned to help execute the warrant. As a result, scattered allegations of racist language do not create a triable issue about whether La Diana was targeted because its owners, employees, and customers were Hispanic. As such, summary judgment in favor of the defendants is granted on these claims.

---

**107.** Mem. in Opp. at 28.

## Destruction of Property

La Diana claims special damages in the amount of $10,914.50 for the destruction of property during the raid. Defendants argue they cannot be held liable for property destroyed during the execution of a search warrant.

 Section 1983 only gives rise to a claim for destruction of property where the police engage in "unnecessarily destructive behavior, beyond that necessary to execute a warrant effectively." [108] With the exception of the breaking of the picture of Our Lady of Guadalupe, plaintiffs have presented no evidence of unnecessarily destructive behavior. Plaintiff Graciela Zamora witnessed the picture get broke. In her deposition she testified:

Q. Did you witness any destruction to that picture?

A. Yes, they took it with their weapons, they went like this. Maybe they were searching for something behind the picture, and the picture dropped and it broke.

Q. Did you see the picture intentionally torn or ripped off the wall?

A. Yes, I think it was intentional. It was with violence that they went like that.

Q. Could you describe more specifically what you saw?

A. When that happened they all came in, different people, some grabbed us and I saw how they threw the picture and they were searching in all, every place. [109]

Ms. Zamora's testimony is ambiguous as to whether the picture was intentionally destroyed. At any rate, plaintiffs have failed to identify which officer or officers may have destroyed the picture. Nor is there any evidence that the destruction of the picture, if intentional, was due to a policy or procedure of the City. As such, defendants are granted summary judgment on La Diana's destruction of property claim.

## Fifth, Sixth, Ninth, and Eleventh Causes of Action

The fifth, sixth, ninth, and eleventh causes of action are each based on state law and were previously dismissed by Judge Kimball. [110] Plaintiffs have given this court no good reason to reexamine those issues beyond a cursory claim that Judge Kimball's ruling was incorrect. As such, summary judgment on these claims is granted in favor of the defendants.

## Remaining State Law Claims

Still remaining are several peripheral state law claims. The reasoning of Judge Kimball's October 22, 2001 order dismissing claims five, six, nine, and eleven applies equally to claims seven, eight, and ten. Therefore, summary judgment is granted in favor of the defendants on these issues.

## Damage Claims

Plaintiffs Cynthia Rodriguez, Maricela Gomez, and Leticia Hernandez were each pregnant at the time of the raid. Cynthia and Maricela each had children who suffered from birth defects. Leticia had a miscarriage. Each attributes these tragedies to the raid. In circumstances such as this, however, the Tenth Circuit has instructed that expert testimony is required in order to prove causation. [111]

**108.** *Mena v. City of Simi Valley*, 226 F.3d 1031, 1041 (9th Cir.2000).

**109.** Dep. Graciela Zamora at 23–24.

**110.** *See* Order, Case No. 2:99–CV–00147K (Oct. 22, 2001).

**111.** *See Curtis v. General Motors Corp.*, 649 F.2d 808, 813 (10th Cir.1981).

## Miscellaneous Issues

Defendant Mayor DeeDee Corradini was previously dismissed from this case but was renamed in plaintiffs' Second Amended Complaint. Plaintiffs have given no reason that Mayor Corradini should be renamed as a defendant. As such, summary judgment is hereby granted in favor of Mayor Corradini on all claims.

### *CONCLUSION*

The court has detailed its reasoning on these issues at considerable length for the benefit of the parties. As a result, the court has found need to recount numerous "facts" alleged by the plaintiffs. In closing, it is worth emphasizing the procedural posture of this case. This case is before the court on the defendants' motion for summary judgment. In this posture, the court must take all of the evidence in the light most favorable to the plaintiffs. They have made various allegations regarding the City's actions in executing the search warrant—about excessive force and detention of the plaintiffs during the raid. These are serious allegations, and the City strongly disputes them. At this stage, the court is in no way finding that these allegations are "true." Instead, the court is simply determining that these disputed allegations must be submitted to a jury. The jury will then determine the truth of the allegations and the reasonableness of the City's actions during the raid.

For all the foregoing reasons, the defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART (# 283-1).